ATLANTIC RICHFIELD COMPANY,
Appellant,

v.

J.R. HOLBEIN and Robert J. Holbein,
Trustees, Appellees.

No. 05–82–00759–CV.

Court of Appeals of Texas,
Dallas.

Feb. 7, 1984.

Rehearing Denied April 24, 1984.

W.B. Browder, Jr., Midland, Albert D. Hoppe, Dallas, for appellant.

John E. Mann, Laredo, Bob Hanna, Abilene, Paul Chitwood, Dallas, for appellees.

Before CARVER, VANCE and STEWART, JJ.

STEWART, Justice.

J.R. Holbein and Robert J. Holbein, Trustees of the Holbein Mineral Trust (the Holbeins), oil and gas lessors, sued Atlantic Richfield Oil Company (ARCO), producer/lessee, for additional oil royalties based on a 1972 letter agreement concerning royalty payments to be paid by ARCO to the Holbeins. After trial without a jury, the trial court rendered judgment in favor of the Holbeins for $300,158.36. ARCO appeals, urging eleven points of error; the Holbeins submit two cross-points of error. For the reasons stated below, we reverse the trial court's judgment and render judgment that the Holbeins take nothing.

The Holbeins derive their royalty interest from five separate gas wells producing from several oil, gas, and mineral leases covering lands in Jim Hogg County, Texas. These wells were completed in 1960 and 1961, and the gas from them has been sold by ARCO in interstate commerce since first production in 1961 under a September 1, 1960, Gas Purchase Agreement with Natural Gas Pipeline Company (Natural). This gas purchase agreement continued in force until it expired by its own terms on March 31, 1981.

In 1972, ARCO and the Holbeins entered into a letter agreement providing for the future method of price computation of the Holbeins' royalties. The agreement provided that, after February 14, 1972, ARCO was to:

... compute and pay the Holbein Trust's proportionate royalty interest based upon the just and reasonable rate as provided in said Opinion No. 595 and any subsequent orders of the Federal Power Commission or successive jurisdictional body or ruling of court of competent jurisdiction.

Thereafter, ARCO paid royalties to the Holbeins on the basis of the Federal Power Commission (FPC) Opinion No. 595, 45 FPC 674 (1977), then on the basis of Opinion No. 749, 54 FPC 3090 (1978), then on the basis of the "old flowing gas" (pre-January 1, 1973) rate under Section 104 of the Natural Gas Act of 1978 (also called the Natural Gas Policy Act, or NGPA) and, finally, under the interstate rollover provision under Section 106 of the NGPA.[1]

The trial court found that Opinion No. 749 did not apply to the Holbein gas [2] and, further, that ARCO paid under the incorrect category of Section 104 of the NGPA because the "old flowing gas" category simply extended Opinion No. 749 rates to April 1, 1981. The trial court found instead that ARCO should have paid royalty to the Holbeins on the basis of the higher rates established in Opinion No. 770–A, 56 FCP 2698 (1981), and, thereafter, under the category of Section 104 of the NGPA that extended the 770–A rates from December 1, 1978, to April 1, 1981. The trial court also found that after April 1, 1981, ARCO correctly paid under Section 106 of the NGPA.

The Holbeins sued primarily to require ARCO to account for the difference between royalties paid and the royalties al-

---

**1.** 15 U.S.C.A. § 3301–3432 (West 1982); § 3314 (Section 104) and § 3316 (Section 106).

**2.** A shorthand description referring to gas produced from the five wells in which the Holbeins owned a royalty interest. We recognize that ARCO had title to the gas under the leases in this case.

legedly owed to them under the 1972 agreement and, alternatively, they sued for damages for breach of ARCO's duty as a reasonably prudent operator under the leases, as amended by the 1972 agreement. The majority of the recovery awarded the Holbeins, whether unpaid royalties or damages, arose from ARCO's non-payment of royalties based on Opinion 770–A rates and its NGPA extensions; the other part of the damages dealt with the trial court's ruling that ARCO should have based the Holbein royalties on the total gas stream volume as measured at the wellhead and reported to the Texas Railroad Commission, rather than on the gas sales volume (plus allowances for condensate) as measured by the amount of gas delivered to its pipeline purchaser.

Both parties agree that the 1972 letter agreement modified the royalty clause in the original leases from a computation of the royalties based on market value of the gas to a computation based on the just and reasonable ceiling rate established by Opinion No. 595 and subsequent FPC opinions. It is also undisputed that the FPC opinions following No. 595 [and 595–A, 46 FPC 827 (1977) ], were Nos. 639, 48 FPC 1299 (1979); 699–H, 52 FPC 1604 (1981); 749; and 770–A. In addition, the parties agree that since December 1, 1978, the NGPA has governed the gas involved here and that the parties are bound by the applicable prices established for the various categories of gas under it in their computation of the royalties due the Holbeins.

However, this controversy arose over which the FPC opinions subsequent to No. 595 and which of the categories under the NGPA are applicable under the 1972 agreement in determining the appropriate rate to be used by ARCO in calculating the Holbein royalties. The trial court acknowledges that if it has erred in holding that Opinion No. 770–A is applicable, then No. 749 is the applicable opinion.

■ In eight points of error ARCO attacks the ultimate finding of the trial court that Opinion No. 770–A, rather than No. 749, applied to the Holbein gas. Based on this finding, the trial court concluded that ARCO breached its contractual duty under the 1972 agreement. This finding also results in the conclusion that ARCO breached its duty as a reasonably prudent operator under the pertinent leases, as amended by that agreement, when it failed to base royalty payments on the higher rates set in Opinion No. 770–A. The trial court found that, notwithstanding the pricing provisions of the 1960 gas sales contract, ARCO had a duty under the 1972 agreement to pay royalties based on the just and reasonable prices (ceiling rates) promulgated by Opinion No. 595 and subsequent FPC opinions.[3] The trial court further found that the 1972 agreement is unambiguous and, although it refers to the 1960 agreement, the latter is not included or incorporated by reference in the 1972 lease modification. Based on these two findings, the Holbeins argue that the trial court correctly construed the 1972 agreement to provide that the just and reasonable rate for calculating their royalties should be determined by treating the gas at issue as though it were free of the particular federal price-fixed category into which it would otherwise fall because of the pre-existing 1960 long-term contract. Whether the trial court was correct in this construction of the 1972 agreement is a crucial issue here.

If the parties intended to disregard the *existence* of the 1960 agreement entirely, including its term of years, which the Holbeins contend, and not just its pricing provisions, then it follows that the parties agreed that royalties would be based on the highest rates set by the FPC in any of its opinions subsequent to No. 595, regardless of whether the existence of the 1960 agreement would be an impediment to ARCO's securing that rate *in fact* for the Holbein gas under the federal regulations. It is undisputed that Opinion No. 770–A,

---

**3.** We agree that the contract price between ARCO and Natural is not binding on the Holbeins (lessors), who were not parties to that contract. *Texas Oil & Gas Corp. v. Vela,* 429 S.W.2d 866, 870–871 (Tex.1968).

through Opinion No. 699–H, set higher rates than Opinion No. 749.

ARCO, on the other hand, contends that the 1972 agreement provides that, subsequent to Opinion No. 595, royalties must be based on the just and reasonable rate contained in the next opinion that is applicable to the gas in issue under the federal regulatory scheme. It further contends that, because the date and term of years of the gas purchase contract determines the proper rate category for this interstate gas, the existence of this contract cannot be disregarded.

■ Although neither party maintained that the 1972 agreement was ambiguous, a question of construction remains, and the agreement must be given the legal effect resulting from the construction of the language contained within the four corners of the instrument. *Pan American Petroleum Corporation v. Robinson*, 405 S.W.2d 698 (Tex.Civ.App.—Eastland 1966, writ ref'd. n.r.e.). In construing the modification of the royalty clause, we must determine the parties' intention. *Superior Oil Co. v. Stanolind Oil & Gas Co.*, 150 Tex. 317, 240 S.W.2d 281, 284 (1951).

The 1972 agreement reflects that Opinion No. 595 was issued in May, 1971, and was in effect when the 1972 agreement was entered into by the parties. This opinion set the just and reasonable rates for gas produced in the Texas Gulf Coast area where the Holbein gas is found, and the parties expressly agreed that ARCO should compute the royalties on that basis. Under Opinion No. 595, as well as the subsequent opinions involved here, the proper category and, thus, the proper ceiling rate for the Holbein gas was determined from the date and term of years of the 1960 gas purchase agreement. When the parties agreed to calculate royalties based on the ceiling rate set in Opinion No. 595, they relied on the existence of the 1960 agreement to determine the proper rate under that opinion. There is no evidence to support an inference that, upon the expiration of No. 595, the parties intended to disregard the existence of the 1960 contract in determining the next just and reasonable rate applicable to the gas in issue.

■ In addition, the trial court found that "FPC Opinions 595, and subsequent opinions, including but not limited to 699–H, 749, and 770–A are incorporated by reference in the February 14, 1972, letter agreement...." This unchallenged finding also compels consideration of the 1960 agreement to determine the proper category of the Holbein gas and, thus, the applicability of the subsequent opinions to this gas, because this pre-existing long-term contract determined the "federal price-fixed category" of the Holbein gas. *Bowers v. Phillips Petroleum Company*, 692 F.2d 1015, 1019 (5th Cir.1982). We hold, therefore, that the trial court erred in disregarding the existence of the 1960 agreement in its determination of whether Opinion No. 749 or No. 770–A was applicable to the Holbein gas under the 1972 agreement.

Nevertheless, the Holbeins contend, and the trial court found, that after January 1, 1971, ARCO had the power under the 1960 gas purchase agreement unilaterally to determine or renegotiate the price at which ARCO would sell the Holbein gas; therefore, ARCO could also renegotiate that contract under its own terms and, through this renewal (replacement) contract, qualify the Holbein gas for the rate of 52 cents per Mcf (1,000 cubic feet) under Opinion No. 699–H and its extension by No. 770–A. ARCO contests these findings by the trial court and maintains that replacement contract sales constitute a separate category; that the Holbein gas was in the category governing sales under contracts that had not expired; and, therefore, that it paid royalties based on the maximum allowable price for the gas under the federal regulations.

In Opinion No. 699–H, the Commission referred to No. 639, stating, "By Opinion No. 639, ... the Commission announced its policy of eliminating vintaging by contract date through the vehicle of allowing the renewal contract to receive the new gas rate *upon expiration of the term of the previous contract* [under its own terms]."

(Emphasis added) 52 FPC 1604, 1631 (1981). Further, in Opinion No. 699, 51 FPC 2212 (1981), No. 699–A, 52 FPC 263 (1981), and No. 699–H, the Commission modified the language of No. 639 regarding renewal contracts and stated in Opinion No. 699–H:

> In making such modifications, we shall continue to require that the *renewal* contract be executed on or after January 1, 1973, or, in the alternative, *that the term of the primary contract has expired* on or after that date, whether or not the renewal contract was executed before that date. *Id.* at 1632. [Emphasis added].

The Holbeins cite *Shell Oil Company v. Federal Power Commission*, 491 F.2d 82 (5th Cir.1974), and *Shell Oil Company v. Federal Power Commission*, 520 F.2d 1061 (5th Cir.1975), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2660, 49 L.Ed.2d 394 (1976), to support their contention that through Opinion No. 639 and No. 699–H the FPC eliminated "older" gas vintage rates and advanced them to 1973–74 vintage rates. They misconstrue the holdings in these cases. The 1974 Shell case affirmed Opinion No. 639 and the 1975 case affirmed Opinion No. 699–H; the decisions did not change the rules established in the respective opinions. Nowhere in either FPC opinion is there language that provides a vehicle to eliminate the "older" gas vintage when an unexpired base contract was in existence, as in this case.

Further, in Section VIII of Opinion No. 770–A, amending its policies, the Commission states that the 52 cent rate applies to three categories of gas, only one of which is urged here:

> ... pursuant to a (A) replacement contract where the sale was formerly made pursuant to a permanent certificate of unlimited duration under such *prior contract which expired by its own term* [sic] on or after January 1, 1973, or pursuant to a contract executed on or after January 1, 1973, where the *prior contract expired by its own terms prior to January 1, 1973;* ... 56 FPC 2698, 2807 (1981). (Emphasis added).

This provision continued the policy of Opinion 699–H permitting "flowing gas" from *expiring contracts* to be repriced at the 52 cent level, escalating at one cent per annum. *Id.* at 2718.

■ In Federal Power Commission terminology a "replacement (renewal) contract" is one between the same producer-seller and pipeline-purchaser as in the base sales contract, which in this case is the 1960 Gas Purchase Agreement between ARCO and Natural. The Commission has stated its position on what constitutes a termination of the base contract for vintaging purposes:

> ... the base contract must run its full "primary term" before the expiring contract can "roll over," and thus qualify under a replacement contract for the 52 cent rate.... By "primary term," we mean the actual number of years specified in the base contract.... *Id.* at 2716–2717.

ARCO and Natural could not have negotiated a replacement contract because the primary term of the 1960 contract did not expire by its own terms until March 31, 1981. Further, the Commission notes that "a producer, whose contract with a pipeline-purchaser has expired, will presumably have to bargain for a replacement contract in order to be eligible for the higher rate [of 52 cents] ..." and then would not qualify for that rate "unless the replacement contract entitled [the seller] to such rate." *Id.* at 2715. *United Gas Pipe Line Co. v. Mobil Gas Service Corp.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956). We hold that ARCO had no power to qualify the Holbein gas for a higher rate under a replacement contract until the expiration of the 1960 agreement on March 31, 1981. At that time, Opinion No. 770–A had been long superseded by the NGPA of 1978.

ARCO further urges that the trial court erred in not finding that FPC Opinion No. 749 applied to the Holbein gas. We agree. The first sentence of No. 749 states that the proceeding is a companion to Docket No. R–389–B, which resulted in Opinion No. 699–H, and that it "was initiated for

the purpose of determining the 'just and reasonable' rate for gas flowing in interstate commerce prior to January 1, 1973." 54 FPC 3090, 3092 (1978). The parties agree that the Holbein gas was flowing in interstate commerce prior to this date. Further, Opinion No. 749 states:

> The purpose of this proceeding is to grant cost-based price relief to sellers of old gas, i.e., gas which commenced flowing in interstate commerce prior to January 1, 1973. Sellers will be permitted to file for increased rates up to a base rate of 29.5 cents per Mcf (or 23.5 cents per Mcf prior to July 1, 1976), to the extent that the increases, together with adjustments for production taxes and other specified costs, are allowed by the provisions of their sales contracts." *Id.* at 3121.

We hold that ARCO did not breach its duty, either contractually under the 1972 letter agreement or as a reasonably prudent operator, to obtain the highest price authorized under federal regulations for the Holbein gas and that ARCO properly filed under Opinion No. 749, rather than No. 770–A, as the applicable FPC opinion subsequent to No. 595. It follows that ARCO also filed under the appropriate categories of the NGPA after December 1, 1978, the effective date of the Act.

ARCO also argues that the trial court erred in finding that ARCO had sufficient contractual authority under the 1960 agreement to file unilaterally for a rate increase with the FPC. We disagree. The 1960 agreement is in evidence, and one clause provides:

> 2. The price schedule set forth in Paragraph 1 above shall continue during the term hereof unless Seller, by written notice given to Pipeline after January 1, 1971, and before January 31, 1971 shall at its sole option elect that thereafter the price to be charged Pipeline for gas delivered hereunder for the remainder of the contract term shall be the following.
>
> The effective rate being charged by Seller on January 1, 1971 shall be superseded as provided herein. It is agreed that Seller shall have the right from time to time to change unilaterally the rates to be charged hereunder by filing such change with the Federal Power Commission without the prior consent of Pipeline thereto; subject however, to Pipeline's right to file complaints with the Commission to protest and oppose any such rate as being unjust or unreasonable or discriminatory, and to intervene in any hearing held by the Commission with respect thereto under the provisions of the Natural Gas Act.

ARCO contends that, because the trial court ruled that the pertinent time period involved in the suit was January 1, *1972*, forward, there is no evidence proving that ARCO gave the required written notice to Natural that it elected to proceed under the alternative price provision of the contract. ARCO further asserts that the provisions of the Natural Gas Act prohibited producers from changing their contract rates by their own unilateral action, citing *United Gas Pipe Line Co. v. Mobil Gas Service Corp.*, 350 U.S. 332, 337, 76 S.Ct. 373, 377, 100 L.Ed. 373 (1956).

The *Mobil* case concerned a fixed-price contract and the court held, therefore, that the seller lacked authority to make a unilateral rate increase filing. The court observed:

> ... the rate-making powers of natural gas companies were to be no different from those they would possess in absence of the Act [NGA]: to establish *ex parte*, and change at will, the rates offered to prospective customers, *or to fix by contract, and change only by mutual agreement, the rate agreed upon with a particular customer. Id.* at 343, 76 S.Ct. at 380. (emphasis added)

Thus, rate filings are valid only if the seller has the underlying contractual authority to file; if the seller lacks this authority, the commission has no jurisdiction to entertain the filing and to determine the lawfulness of the rate increase. Therefore, initially, the commission had to determine the threshold issue of contractual authority.

*Pennzoil Co. v. Federal Energy Regulatory Commission*, 645 F.2d 360, 374 (5th Cir.1981).

The alternative price provision in the 1960 agreement for changing the rate during the contract term (escalation clause) gives valid contractual authority to make a unilateral rate increase filing, subject only to the limits and procedures of the NGA. *United Gas Pipeline Co. v. Memphis Light, Gas & Water Division*, 358 U.S. 103, 112, 79 S.Ct. 194, 199, 3 L.Ed.2d 153 (1958). Consequently, if ARCO exercised its option to proceed under the escalation clause, it had sufficient contractual authority to file unilaterally for a rate increase.

Although there is no direct testimony that ARCO exercised its option to proceed under the alternative price provision of the contract, there are exhibits in the record reflecting that beginning in February, 1971, and from time to time thereafter, ARCO did in fact file for increased rates and that the commission approved the requested increases. The trial court was entitled to infer that ARCO had the necessary contractual authority to file because the commission necessarily had to so determine before approving the rate change. *Pennzoil*, 645 F.2d at 374.

In addition, ARCO and Natural amended the 1960 agreement on November 1, 1978, and adopted an "area rate clause" that permits an increase in the price to the applicable just and reasonable area ceiling rate which "the FERC ... or Congress, shall at any time or times prescribe or permit...." Area rate clauses provide sufficient contractual authority to collect the applicable maximum lawful price provided under the NGPA. *Pennzoil*, 645 F.2d at 372.

We hold that the trial court did not err in finding ARCO had and has sufficient contractual authority to file unilaterally for a rate increase, and this point of error is overruled. However, ARCO's authority in this respect does not affect the outcome of this appeal, for there is no evidence to show that ARCO failed to exercise properly its contractual authority to file unilaterally

for a rate increase. In fact, the trial court apparently made this finding to substantiate its further finding that ARCO had the power unilaterally *to renegotiate* its contract with Natural, a power we have held ARCO did not have.

We have held that ARCO used the correct *price* in computing the royalty payments due the Holbeins; we now consider whether ARCO applied that price to the correct *volume* of gas produced from the Holbein wells. ARCO complains of the trial court's finding that "ARCO had a duty to calculate the volume of gas, for purpose of royalty payments, at the wellhead" and of the further finding that ARCO was required to pay royalty on all three volume components reflected in its production report filings with the Railroad Commission because they are the most accurate and precise measure of the volume of gas for purposes of calculating the Holbeins' royalty payments. Initially, we note that these findings conflict because the Railroad Commission reports reflect three *allocated* volumes, not volumes measured at the wellhead. Nevertheless, we will address ARCO's arguments against both findings.

■■ ARCO first claims that it properly paid royalty on the basis of the gas sales volume as measured by the amount of gas delivered to its pipeline purchaser because the "just and reasonable" rates authorized by the FPC opinions and by the NGPA are all fixed on this basis, and, therefore, to pay such prices on the total volume produced at the wellhead would violate such opinions, orders and law. We agree that the gas sales/delivery volume is the correct volume for calculating the amount due from the *pipeline purchaser* to the producer under the federal regulations, but this measure of volume is not binding on the Holbeins in the computation of their royalty unless the terms of the 1972 agreement so provide. *See Mobil Oil Corp. v. Federal Power Commission*, 463 F.2d 256 (D.C. Cir.1972) *cert. den.* 406 U.S. 976, 92 S.Ct. 2409, 32 L.Ed.2d 676 (1972). This agreement only addresses rates; it is silent on

the subject of volume. We hold, therefore, that the federal regulations do not control the measure of volume to be used in calculating the Holbein's royalty.

ARCO also contends that it does not have a duty to base royalty payments on the total production volume reported to the Railroad Commission because that total includes a volume component for fuel gas, for which no royalty is due under the free use clause of the Holbein leases. The undisputed testimony shows that the production of a well reflected in the reports filed with the Railroad Commission is the total of the gas disposition from that well, which, in this case, is the total of three allocated volumes attributable to each of the Holbein wells: sales volume, fuel volume and shrinkage volume. The trial court found that the Railroad Commission reports are the most accurate record of the volume of gas produced from the Holbein wells. In addition, it is undisputed that ARCO paid royalties based on the sales and shrinkage volumes reported to the Railroad Commission; therefore, the issue narrows to whether ARCO should have paid royalty based on the fuel volume reported.

The Holbeins assert that the 1972 agreement does not provide for a deduction for fuel volumes, but, ARCO replies, neither does this agreement purport to change the original lease provisions for fixing the volume of gas upon which payments are due. ARCO maintains that, to the extent the 1972 agreement is silent, the original leases fill the void. These leases provide that "Lessee shall have free use of oil, gas ... from said land ... for all operations hereunder, and the royalty on oil, gas and coal shall be computed after deducting any so used." According to the uncontradicted testimony, the fuel gas was used for compression operations so that gas could be delivered into the pipeline and sold. Therefore, ARCO contends that this use of fuel gas was included in the free use clause of the leases.

However, the Holbeins argue that, since gas from many wells other than the Holbeins' feed into the same facility, there must be evidence that the Holbein gas needed compression before fuel gas for this purpose would be included in the free use clause of their leases. The evidence reflects that the gas from all of the wells in the field where the Holbein wells are located is commingled as it comes out of the individual wellheads. ARCO gathers the commingled gas at its dehydration facility, processes it, and delivers it from the facility's tailgate to the pipeline purchaser. Thus, it is impossible to determine the nature of the gas from an individual well and the amount of compression, if any, it may need to deliver it into the pipeline. Consequently, all the wells are charged proportionately for the fuel gas used for the compression of the total volume of the commingled gas gathered at the facility. The sales, shrinkage, and fuel volumes are all allocated back to the individual wells by the same method, and these are the volumes reflected in the Railroad Commission reports.

■ The Holbeins do not contend that, if the gas from their wells needed compression, ARCO's use of an allocated volume or its computation is incorrect, nor do they contend that the free use clause would not encompass fuel gas used to compress that gas for its delivery into the pipeline. We conclude that the Holbeins are taking an inconsistent position. In effect, on the one hand, they are attacking the use of an allocated volume for fuel gas and demanding a showing of the actual volume, if any, used to compress their gas; on the other hand, they are relying on the allocated sales and shrinkage volumes reflected in the Railroad Commission reports as the most accurate volumetric record upon which to base their royalty payments. Under the circumstances, we hold that the Holbeins are bound by the allocated fuel gas volume reflected in the Railroad Commission reports, which they introduced in evidence.

■ ARCO further maintains that, because the 1972 agreement makes no provision for the volume upon which royalty payments are to be based, we may look to

industry custom and usage as a guide. *Luling Oil & Gas Co. v. Humble Oil & Refining Co.,* 144 Tex. 475, 191 S.W.2d 716 (1945). The uncontroverted testimony was that it is an industry-wide practice to deduct the allocated volume for fuel gas before computing the settlement owed to royalty owners, citing the COPAS Manual (Council of Petroleum Accountants Societies). For the foregoing reasons, we hold that no royalty was due for the fuel volumes reflected in the Railroad Commission reports. ARCO's ninth point of error is sustained.

Finally, ARCO argues that the trial court erred in finding that it has a duty to make royalty payments within thirty days after the *sale* of the Holbein gas because there is no evidence to support this finding or, in the alternative, the evidence is conclusive against the finding. McDonald, *Texas Civil Practice in District and County Courts,* Vol. 4, § 16.10, page 29. Neither the leases nor the 1972 agreement make provision for the time to pay royalties. The evidence in the record only establishes the time that ARCO has paid royalties in the past; it does not bear on *when* ARCO should have paid except for a period from 1970–74 when division orders in evidence required payment each month on gas delivered during the second preceding calendar month. After March 27, 1974, the division orders were silent about time of payment.

The Holbeins maintain that, because there is no evidence of when ARCO should have made royalty payments following March 27, 1974, the law implies a reasonable time. They argue that thirty days from date of sale is reasonable, citing *Schupbach v. Continental Oil Co.,* 193 Kan. 401, 394 P.2d 1 (1964). They assert that *Schupbach* stands for the proposition that interest on royalty should be computed from thirty days after the lessee sells the gas, and, therefore, royalty was necessarily due at that same point in time.

■ We agree that, because no contractual provision controls, ARCO is entitled to a reasonable time within which to make the necessary computations and to perform the mechanics of delivering royalty payments for production or sales already realized. Kuntz, Law of Oil and Gas, Vol. 3, § 42.3, p. 360. ARCO's witness, Addington, testified that it was ARCO's practice to record revenue the month after production and to pay the royalty owners the following month. In their brief, the Holbeins admit that ARCO gets paid in the month following a "sale," which is the month following delivery to the pipeline purchaser, *Texas Oil & Gas Corp. v. Vela,* 429 S.W.2d at 871, and the 1960 agreement so provides. Moreover, a close reading of *Schupbach* reveals that the Kansas Supreme Court held that interest should be allowed from the month following the date of *payment* by the purchaser to the lessee, not from thirty days after *sale. Schupbach,* 193 Kan. 401, 394 P.2d at 6.

■ We hold that there is no evidence, nor any legal authority cited, to support the trial court's finding that ARCO had a duty to pay royalty payments thirty days after the sale of the Holbein gas. To the contrary, the evidence supports the conclusion that payment of royalties each month on the gas delivered during the second preceding calendar month is payment within a reasonable time under the facts of this case and, also, in accordance with the *Schupbach* case upon which the Holbeins rely.

■ However, there is testimony in the record that on several occasions ARCO did not timely pay each month for gas delivered during the second preceding calendar month. The damages awarded by the trial court for interest on these late payments, if any, cannot stand because there is no pleading to support such an award. The Holbeins pleaded for interest on deficiencies in payment of royalties but not for interest on late payments which had been tendered and accepted.

ARCO's eleventh point of error concerns the method the trial court used to compute damages. This point is now moot in the light of our previous holdings.

We regard the above points to be dispositive of ARCO's appeal. Its other points have been considered and are overruled.

The Holbeins urge in two cross-points of error that: (1) the trial court erred in failing to find that ARCO was directly obligated under the 1972 agreement to file under FPC Opinion 699–H to eliminate the "old" gas vintage of the Holbein gas and (2) the trial court erred in finding that Section 104 of the NGPA from December 1, 1978, until April 1, 1981, and, thereafter, Section 106 of the NGPA provided the next higher ceiling rates applicable under the 1972 agreement. We overrule the first cross-point for the reasons stated previously in this opinion.

Although the second cross-point is multifarious in that it involves two distinct periods of time and two different sections of the NGPA, it is sufficient to direct our attention to the matter complained of so that we may determine the question of reversible error. *Bass v. Metzer*, 569 S.W.2d 917 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.). In the first portion of this cross-point, the Holbeins contend for the first time on appeal that Section 109 applied to the gas in issue from December 1, 1978, to April 1, 1981. In the trial court, the Holbeins agreed that Section 104 applied to the gas in issue during this period. ARCO filed a motion to strike appellees' second cross-point claiming that this court has no jurisdiction to consider it because the Holbeins never apprised the trial court of its contention that Section 109 applied during the period of December, 1978, to April, 1981. We agree that the trial court must be informed of any complaint or objection the successful party has to the judgment. *West Texas Utilities Company v. Irvin*, 161 Tex. 5, 336 S.W.2d 609, 610 (1960). Accordingly, we sustain ARCO's motion to strike this portion of the cross-point. Further, we overrule the other portion of this cross-point where the Holbeins' claim that Section 109, rather than Section 106, applies to this gas after April 1, 1981, for the reasons previously stated in this opinion.

The judgment of the trial court is reversed and judgment is rendered that the Holbeins take nothing.