**Affirmed and Opinion filed October 6, 2016.**



In The

# Fourteenth Court of Appeals

### NO. 14-15-00058-CV

## HIGHMOUNT EXPLORATION & PRODUCTION LLC AND DOMINION OKLAHOMA TEXAS EXPLORATION & PRODUCTION, INC., Appellants

### V.

## HARRISON INTERESTS, LTD., DAN J. HARRISON III, AND BFH MINING, LTD., Appellees

**On Appeal from the 190th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2009-06060**

## O P I N I O N

At issue in this appeal is the interpretation of an agreement governing the payment of royalties by an oil and gas producer. The royalty owners filed suit asserting that the producer was underpaying them because (1) the royalty agreement entitled the owners to royalties the producer was not paying and (2) the producer was improperly deducting marketing costs in calculating the royalties owed to the royalty owners. Both parties filed summary-judgment motions on both

issues. The trial court granted the royalty owners' summary-judgment motions. We affirm.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

In conjunction with the sale of their interests in certain real property to Meridian Oil Production, Inc. in 1990, Harrison Interests, Ltd., Dan J. Harrison III, and Bruce F. Harrison reserved a "5% of 8/8 perpetual nonparticipating royalty interest," and the parties entered into a royalty agreement to set out the terms governing the administration and payment of the royalty interests (the "Agreement"). Appellant/defendant Dominion Oklahoma Texas Exploration & Production, Inc., a successor-in-interest to Meridian Oil Production, Inc., sold the mineral interests to appellant/defendant HighMount Exploration & Production, Inc. in 2007.

The same year, appellees/plaintiffs Harrison Interests, Ltd., Dan J. Harrison III, and BFH Mining, Ltd. (collectively the "Harrison Parties") requested an audit and concluded from the audit results that HighMount Exploration & Production, Inc. and Dominion Oklahoma Texas Exploration & Production, Inc. (collectively the "HighMount Parties") had not been paying them the full amount owed under the Agreement. Based on the audit, the Harrison Parties raised two issues related to royalty payments. First, the Harrison Parties claimed the HighMount Parties had not been paying them royalties on gas produced from the real property, oil and gas leases, and oil, gas, and mineral leases that were the subject of the 1990 conveyance and the Agreement (hereinafter "Subject Interests") and used as fuel to power equipment on the Subject Interests. Second, the Harrison Parties claimed the HighMount Parties had been deducting marketing costs improperly.

2

## A. Claims

The Harrison Parties filed suit against the HighMount Parties in January 2009, eventually asserting claims for breach of the Agreement, conversion, and claims based on alleged violations of the Texas Natural Resources Code.[1] The Harrison Parties asserted their entitlement to royalties on all gas used for fuel on the Subject Interests under section 4(e) of the Agreement.

## B. Summary Judgment Motions

The HighMount Parties moved for partial summary judgment, arguing that section 4(e) of the Agreement does not entitle the Harrison Parties to compensation for gas the HighMount Parties use for fuel on the Subject Interests and that the HighMount Parties are entitled to deduct the marketing costs in calculating the royalties owed under the Agreement. The Harrison Parties filed two separate summary-judgment motions in which they asserted they are entitled to royalties on gas used for fuel on the Subject Interests and that the HighMount Parties breached the Agreement by deducting marketing costs in calculating the royalties owed. The trial court granted both of the Harrison Parties' summary-judgment motions and denied the HighMount Parties' summary-judgment motion.

The Harrison Parties moved for rendition of a final judgment, attaching to the motion evidence of their damages and reasonable and necessary attorney's fees. The trial court rendered a final judgment and awarded the Harrison Parties actual damages, prejudgment interest, and reasonable and necessary attorney's fees. The HighMount Parties have appealed.

---

[1] The Harrison Parties later nonsuited their conversion claims.

## II.     ISSUES AND ANALYSIS

The trial court granted two traditional summary-judgment motions in favor of the Harrison Parties on two issues relating to the construction of the Agreement. The HighMount Parties challenge the trial court's granting of both of these summary-judgment motions. We review a grant of summary judgment de novo. *KCM Financial LLC v. Bradshaw*, 457 S.W.3d 70, 79 (Tex. 2015). In a traditional summary-judgment motion, if the movant's motion and summary-judgment evidence facially establish its right to judgment as a matter of law, the burden shifts to the nonmovant to raise a genuine, material fact issue sufficient to defeat summary judgment. *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000). In our review of the trial court's granting of the Harrison Parties' traditional summary-judgment motions, we consider all the evidence in the light most favorable to the HighMount Parties, crediting evidence favorable to the HighMount Parties if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *See Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). The evidence raises a genuine fact issue if reasonable and fair-minded jurors could differ in their conclusions in light of all the summary-judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007). When the order granting summary judgment does not specify the grounds upon which the trial court relied, we must affirm the summary judgment if any of the independent summary-judgment grounds is meritorious. *FM Props v. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000).

### A. Did the trial court err in granting summary judgment as to the royalties allegedly owed on gas used for fuel on the Subject Interests?

In one of the Harrison Parties' summary-judgment motions, they asserted that, as a matter of law, the HighMount Parties breached the Agreement by failing

to pay the Harrison Parties royalties on gas used for fuel on the Subject Interests. Section 4(e) of the Agreement provides that the "Owners shall receive their royalty share of the gross proceeds for gas used or utilized on or off the Subject Interests, such as gas used for fuel." Under their first issue, the HighMount Parties argue that the trial court erred in granting summary judgment on this ground because (1) there are no "gross proceeds" for gas used for fuel on the Subject Interests, (2) under the cost-sharing methodology in the Agreement, the HighMount Parties do not owe the Harrison Parties for post-production costs that jointly benefit both parties, (3) when section 4(e) is considered in the context of the entire Agreement, it is clear that the Agreement does not require the HighMount Parties to pay the Harrison Parties royalties on gas used for fuel in the plant, (4) the interpretation the Harrison Parties suggest is problematic because it is difficult to calculate the royalty amount on gas used for fuel on the Subject Interests, and (5) the provision assessing royalties on "residue gas" shows the parties did not intend for royalties to be paid on gas used for fuel on the Subject Interests.

The Agreement provides in relevant part:

(a) As to gas produced or to be produced from the Subject Interests under a Short Term Sale, the royalties shall be Owners' royalty share of the gross proceeds for the first sale or disposition of the gas from the Subject Interests, provided that such royalties never shall be less than Owners' royalty share of the aggregate sum derived by multiplying the Spot Gas Price of such gas for the month or months covered by the Short Term Sale by the respective volumes of gas sold in such month or months under the Short Term Sale.

(b) In the event Producer intends to make gas produced or to be produced from the Subject Interests subject to a Long Term Sale. . .

(c) If the gas produced from the any well situated on the Subject Interests shall contain in suspension condensate, gasoline or other natural gas liquid hydrocarbons that economically can be separated from the gas by the installation by Producer of traps, separators or

5

other mechanical devices, then Producer shall install such devices on the surface of the Property, and Owners shall receive royalty on the condensate, gasoline or other natural gas liquids so recovered in accordance with the terms of paragraph 3 of this Royalty Agreement, together with royalty on the residue gas in accordance with the terms of paragraphs 4(a) and 4(b) of this Royalty Agreement.

(d) If gas or casinghead gas or separated gas resulting from field separation produced from the Subject Interests is processed at any location by or for the account of Producer, or by or for the account of any affiliate of Producer, for the recovery and sale or other disposition for value of liquid hydrocarbons, helium, carbon dioxide, sulfur, or any other elements of the gas stream, then in lieu of royalties on gas provided in paragraphs 4(a) and 4(b), the royalties shall be Owners' royalty share of the gross proceeds less Owners' royalty share allocable portion of the reasonable, direct costs (excluding amortization and depreciation on pipeline and plant investment and direct overhead associated therewith) of processing such gas in the plant for the recovery of such liquid hydrocarbons, helium, carbon dioxide, sulfur and other elements, and the royalties on the residue gas resulting from such processing operation attributable to gas produced from the Subject Interests shall be in an amount and determined as provided in paragraphs 4(a) and 4(b) above; provided, however, that in the event liquid hydrocarbons, helium, carbon dioxide, sulfur or any other elements of the gas stream are recovered and sold separate from the basic gas stream as contemplated in this paragraph, the total royalties paid to Owners on such production (after deduction of the above costs) never shall be less than would have been paid to Owners if the liquid hydrocarbons, helium, carbon dioxide, sulfur, or any other elements of the gas stream had remained in, and been sold as, part of the basic gas stream.

(e) Owners shall receive their royalty share of the gross proceeds for gas used or utilized on or off the Subject Interests, such as gas used for fuel.

The Agreement defines "gross proceeds" as:

the entire economic benefit and all consideration in whatever form received by or accruing to Producer or an affiliate of Producer, including but not limited to sales proceeds or proceeds or benefits of an exchange, prepayments for future production, reimbursements for

6

severance taxes or for other taxes or costs, settlements or payments for the release or amendment of a sales contract or arrangement, and take-or-pay payments or settlements and the like, and any insurance proceeds from lost or destroyed oil and gas, provided that "gross proceeds" shall not include any fee or charge for services (transportation, compression, treating and the like) relating to gas produced from the Subject Interests after such gas leaves the Subject Interests. In the event Producer transports, or causes to be transported, gas production from the Subject Interests on a gas transmission line to a market or sale "gross proceeds" for such gas shall be determined after deducting any fees or charges incurred by Producer from the owner of the gas transmission line for such delivery or transportation to such market or sale; such fees or charges shall be for transportation of gas after it leaves facilities to which Marketing Costs, if any, relate and shall exclude fees or charges of Marketing Costs.

In construing contracts, our primary concern is to ascertain and give effect to the intentions of the parties as expressed in the contract. *Kelley-Coppedge, Inc. v. Highlands Ins. Co*., 980 S.W.2d 462, 464 (Tex. 1998). To ascertain the parties' intentions, we examine the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co*., 995 S.W.2d 647, 652 (Tex. 1999). Whether a contract is ambiguous is a question of law for the court. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation. *Id*. But, when a written contract is worded so that it can be given a certain or definite legal meaning or interpretation, we hold it unambiguous, and we construe it as a matter of law. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). We cannot rewrite the contract or add to its language under the guise of interpretation. *See id.* at 162.

### 1. *The plain language of section 4(e), the context of the Agreement, and the provision relating to residue gas*

In section 4(e) the parties specifically address gas used for fuel on or off the Subject Interests. The gas in question is gas used for fuel on the Subject Interests. Under the plain language of section 4(e) the Harrison Parties are to receive their royalty share of the gross proceeds for this gas. The HighMount Parties argue both that there are no gross proceeds from the gas used for fuel on the Subject Interests and that sections 4(c) and 4(d) also govern gas used as fuel on the Subject Interests because the gas entering the Subject Interests is separated. The HighMount Parties state that section 4(d) allows them to deduct processing costs from the royalty on the separated elements and that under these provisions the Harrison Parties are entitled to gross proceeds only on residue gas.

In the Agreement the parties define "gross proceeds" as "the entire economic benefit and all consideration in whatever form received by or accruing to Producer . . . ." The HighMount Parties acknowledge receiving an economic benefit from the gas used for fuel on the Subject Interests. The economic benefit to the HighMount Parties is that the HighMount Parties do not have to pay for other fuel to be used to power the equipment on site. The HighMount Parties argue that even if the gas used for fuel provides an economic benefit, each example of gross proceeds stated in the definition is an example in which the Producer alone receives an economic benefit. Even presuming that this is so, nothing in the plain language of the definition excludes from its scope situations in which both the Producer and the royalty owners receive an economic benefit. To the contrary, the term "gross proceeds" encompasses all economic benefits flowing to the Producer, except for specific exclusions, which include fees or charges for certain services relating to gas produced from the Subject Interests. The definition of

8

"gross proceeds" contains no exclusion for economic benefits received by the Producer from the use of gas produced from the Subject Interests for fuel. Nor does the provision contain any general exclusion for economic benefits received by the Producer in a situation in which the royalty owners also receive an economic benefit.

Under certain circumstances described in sections 4(c) and 4(d), the Agreement provides that the royalty owners shall receive royalties on residue gas in accordance with the terms of sections 4(a) and 4(b) of the Agreement. The HighMount Parties assert that the agreement that the Producer shall pay royalties on residue gas shows that the parties did not intend for any royalty to be paid on gas consumed in the treatment and processing steps. As with other contracts under Texas law, parties to a royalty agreement have a broad freedom to agree as to the nature and scope of the royalties to be paid, as to how the royalties will be calculated, and as to the items on which royalties must be paid. *See French v. Occidental Permian, Ltd.*, 440 S.W.3d 1, 8 (Tex. 2014) (stating that parties are free to agree on what royalty is due, the basis on which it is to be calculated, and how expenses are to be calculated); *Nafta Traders, Inc. v. Quinn,* 339 S.W.3d 84, 95 (Tex. 2011) (stating that "[a]s a fundamental matter, Texas law recognizes and protects a broad freedom of contract"). The parties' agreement in section 4(c) regarding the payment of royalties on residue gas, condensate, gasoline, and other natural-gas liquids does not show that the parties could not or did not agree in section 4(e) that the Producer would pay royalties on gas used for fuel. The HighMount Parties cite a case in which the agreement did not expressly address whether royalties would be paid on fuel gas and the court gave effect to industry custom and usage, under which, according to the uncontroverted evidence in that case, no royalty was paid for fuel gas. *See Atlantic Richfield Co. v. Holbein*, 672

9

S.W.2d 507, 515–16 (Tex. App.—San Antonio 1984, writ ref'd n.r.e.). The *Holbein* case is not on point because the Agreement in today's case expressly provides that royalties shall be paid on the gross proceeds of gas used for fuel and because parties are free to expressly agree to a term that contradicts a custom or usage.[2] *See 4N Intern., Inc. v. Metropolitan Transit Auth.*, 56 S.W.3d 860, 862–63 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). Under the plain language used in section 4(e), the Producer must pay royalties on the gross proceeds of gas used for fuel.[3]

### 2. Cost-sharing Methodology

The HighMount Parties argue that even if "a simplistic reading" of the section 4(e) leads to the conclusion that the HighMount Parties owe the Harrison Parties royalties, the overall cost-sharing methodology demonstrated throughout the Agreement shows the parties intended to share the post-production costs of the gas. The HighMount Parties point out that section 4(d) allows them to deduct costs for extracting hydrocarbons in the circumstances described in that section and that the general terms of the Agreement allow the HighMount Parties to deduct costs for the processing and transportation of gas. According to the HighMount Parties, post-production costs are shared when the costs jointly benefit the owner and Producer. They argue that because using gas for fuel on the Subject Interests jointly benefits the Harrison Parties and the HighMount Parties, the Harrison Parties should share the cost of the gas used for fuel.

While the parties agreed to share some post-production costs, the plain

---

[2] In addition, the summary-judgment evidence in this case does not contain any custom-and-usage evidence.

[3] The *Birnbuam v. SWEPI, L.P.* case cited by the HighMount Parties is not on point because the agreement in that case did not contain such an express provision. *See* 48 S.W.3d 254, 255–58 (Tex. App.—San Antonio 2001, pet. denied).

language of the Agreement entitles the Harrison Parties to royalties on gas used for fuel. *See Kachina Pipeline Co., Inc. v. Lillis*, 471 S.W.3d 445, 454 (Tex. 2015). Although other provisions in the Agreement contain a cost-sharing scheme, there is no express language stating that the intent of the Agreement is for the parties to share post-production costs in all instances. Nothing in the Agreement forecloses an interpretation that the parties intended to share many post-production costs, but that they intended for the Producer to receive royalties on the gross proceeds of gas used for fuel. The plain language of the Agreement states that the owners are to receive such royalties.

### 3. *Problematic calculations*

The HighMount Parties assert that interpreting the Agreement to conclude they owe the Harrison Parties royalties on gas used for fuel is absurd because there is no way to calculate the royalty amount on gas used for fuel. But, the record reveals that such a calculation is possible. After the Harrison Parties audited the HighMount Parties in 2007, the auditor prepared an exhibit showing the monthly amount of royalty that had not been paid in respect of the gas used for fuel. The evidence shows that the Harrison Parties were able to calculate an underpayment amount. After the trial court granted the Harrison Parties' summary-judgment motion, the Harrison Parties submitted evidence regarding the amount of these royalties that the HighMount Parties had failed to pay, and the trial court rendered a final judgment based on these damage amounts. In the trial court, the HighMount Parties stated that the Harrison Parties' computation of these damages was accurate, and the HighMount Parties have not challenged on appeal the trial court's determination of the amount of these damages. The record shows that it is not impossible to calculate the economic benefit received by or accruing to the HighMount Parties from the use of gas produced from the Subject Interests for

11

fuel, nor is it impossible to calculate the royalty to be paid on this benefit. The plain text of the Agreement requires the HighMount Parties to pay the Harrison Parties royalties on gas used for fuel on the Subject Interests. *See Kachina Pipeline Co., Inc.*, 471 S.W.3d at 454. The trial court did not err in granting the Harrison Parties' summary-judgment motion in this regard. Accordingly, we overrule the HighMount Parties' first issue.

**B. Did the trial court err in granting summary judgment as to the marketing costs?**

Under their second issue, the HighMount Parties assert that the trial court erred in granting the Harrison Parties' summary-judgment motion as to liability on the claim that the HighMount Parties breached the Agreement by deducting marketing costs in calculating the royalties owed based on the costs of compressors at the "DP6" facility. In addition to other summary-judgment grounds, the Harrison Parties asserted in this motion that to deduct the costs of the DP6 compressors, the Agreement requires that these compressors be downstream from a "central facility" and that these compressors are not downstream from a "central facility."

*1. Language from the Agreement*

Section 7(b) of the Agreement provides as follows:

> All royalties shall be determined and delivered or paid to Owners after deducting therefrom the following costs:
>
> > (i) as to gas produced from the Subject Interests, Owners' royalty share of Producer's monthly Marketing Costs for such gas; however, for purposes of this paragraph 7(b), Producer's monthly Marketing Costs (whether actually incurred by Producer or an affiliate of Producer or charged to the Producer by a third party) shall not exceed ten (10) cents per MCF and shall be charged only as to gas production put

through the facility for which the Marketing Costs are charged; . . .[4]

The Agreement defines "Marketing Costs" as:

(i)  the reasonable, capital costs of property actually installed by Producer or an affiliate of Producer after the Effective Time, which property:

(a) is depreciable for purposes of the Internal Revenue Code of 1986, as amended; and

(b) is required to be installed downstream from a central facility in order to deliver gas produced from the Subject Interests to a gas transmission line or otherwise to a market; and

(c) is part of a facility to transport gas produced from the Subject Interests from a central facility to a gas transmission line or is part of a facility compressing or treating such gas as required for delivery to such a gas transmission line; and

(ii)  charges made by a third party that is not an affiliate of Producer directly attributable to property actually installed after the Effective Time, which property:

(a) is installed downstream from a central facility in order to transport gas produced from the Subject Interests to a gas transmission line or otherwise to a market; and

(b) is part of a facility required to transport gas produced from the Subject Interests from a central facility to a gas transmission line, or is part of a facility compressing or treating such gas as required for delivery to such a gas transmission line.

The Agreement defines a "central facility" as:

the final set of heaters, separators, meters and tanks that are operated

---

[4] "MCF" is defined in the Agreement as "one thousand (1000) cubic feet of gas with 'cubic feet of gas' meaning the amount of gas contained in a cubic foot of space and at a base pressure of fourteen and sixty-five one-hundredths (14.65) pounds per square inch absolute and at a base temperature of sixty degrees Fahrenheit."

13

as a unit and into which production from more than one oil or gas well on the Subject Interests is gathered for final treating and measurement prior to delivery to a gas transmission line owned or operated by a principal purchaser of gas in the Permian Basin.

Under the unambiguous language of the Agreement, for the DP6 compressor costs to be the basis of the marketing-costs deduction in the royalty calculation the DP6 compressors must be located downstream from a final set of heaters, separators, meters, and tanks that are operated as a unit and into which production from more than one oil or gas well on the Subject Interests is gathered for final treating and measurement before delivery to a gas transmission line owned or operated by a principal purchaser of gas in the Permian Basin.

## 2. *The Harrison Parties' Summary-Judgment Evidence*

Seeking to negate this proposition as a matter of law, the Harrison Parties attached to their summary-judgment motion the affidavit of Don Rockwell, who testified as follows:

- Rockwell is the West Texas Area Engineer for Harrison Interests, Ltd. and has reviewed Harrison's files regarding the Sonora Ranch and the leases granted to Meridian in Annexes 1 and 2 of the Agreement, otherwise referred to as the "Subject Interests."

- Rockwell has personal knowledge of the facts stated in his affidavit, and those facts are true and correct.

- Rockwell has visited the Sonora field in his duties as West Texas Engineer.

- The property contains a number of central processing facilities that treat and process gas subject to the Agreement.

- One of those central processing facilities is called "DP6" and is located to the south of the Sonora Ranch. The compressors on this facility compress the gas production off the Subject Interests into a high-pressure gas line and on to a nearby transmission line to market

14

for sale. The compressors are located on the DP6 central facility and are part of the facility.

- Once the gas leaves the compressors, the gas then goes through other vessels on the facility, such as a filter separator, an eight-inch discharge meter, an amine contactor, a heat exchanger, a recovery separator, and a dehydration tower, before it flows to sale.

- Downstream from these compressors are a series of heaters, separators, meters, tanks, and other vessels, where the gas is further treated and eventually sent to market.

- From Rockwell's understanding of the Agreement, none of these compressors are downstream from a central facility, as that term is defined.

The Harrison Parties' summary-judgment evidence proved as a matter of law that the DP6 compressors are not located downstream from a "central facility," as that term is defined in the Agreement. The Harrison Parties' summary-judgment motion and summary-judgment evidence facially establish their right to judgment as a matter of law as to whether the HighMount Parties breached the Agreement by deducting marketing costs based on the costs of the DP6 compressors. *See Willrich*, 28 S.W.3d at 23–24. Therefore, the burden shifted to the HighMount Parties to raise a genuine, material fact issue sufficient to defeat summary judgment. *See id.*

### 3. The Complete Absence of Authentication of the HighMount Parties' Summary-Judgment Evidence

In response to the Harrison Parties' summary-judgment motion regarding the deduction of marketing costs, the HighMount Parties submitted two documents as summary-judgment evidence—a two-page memorandum signed by an attorney-expert and a one-page diagram of the DP6 facility.[5] These documents were

---

[5] The memorandum does not purport to be an affidavit, and the HighMount Parties do not assert on appeal that the memorandum is an affidavit.

attached to the HighMount Parties' summary-judgment response. The HighMount Parties submitted no affidavit, testimony, or other evidence to authenticate the memorandum or the diagram. There was a complete failure to authenticate the memorandum and the diagram.[6]

In *In re Estate of Guerrero*, this court, sitting en banc, determined that under precedent from the Supreme Court of Texas and from this court, a document submitted as evidence in a summary-judgment or a motion-to-compel-arbitration context has a substantive defect and is incompetent if there was a complete failure to authenticate the document.[7] *See* 465 S.W.3d 693, 705, 706–08 (Tex. App.— Houston [14th Dist.] 2015, pet. filed) (en banc). Thus, the complete absence of authentication of the memorandum and the complete absence of authentication of the diagram are substantive defects that are not waived by the failure to object and obtain a ruling in the trial court. *See id.* at 706–08. Under this court's precedent in *In re Estate of Guerrero*, these substantive defects make the memorandum and diagram incompetent to raise a genuine fact issue to prevent a summary judgment. *See Elizondo v. Krist*, 415 S.W.3d 259, 264 (Tex. 2013) (holding that conclusory statements are incompetent to create a fact issue to prevent a summary judgment); *In re Estate of Guerrero*, 465 S.W.3d at 705, 706–08 (holding that a complete

---

[6] In the memorandum, the attorney-expert states that he incorporates into the memorandum the contents of a prior memorandum. The HighMount Parties did not submit this prior memorandum in response to the marketing-costs summary-judgment motion, but they appear to have submitted the other memorandum in response to the summary-judgment motion that is the subject of the first appellate issue. Presuming without deciding that we may consider the other memorandum in determining whether a fact issue exists as to the marketing-costs motion, there was a complete failure to authenticate the other memorandum as well.

[7] The *In re Estate of Guerrero* court relied upon the *Mansions in the Forest* precedent from the Supreme Court of Texas in this regard. *See In re Estate of Guerrero*, 465 S.W.3d 693, 708 (Tex. App.—Houston [14th Dist.] 2015, pet. filed) (en banc) (citing *Mansions in the Forest, L.P. v. Montgomery County*, 365 S.W.3d 314, 317 (Tex. 2012) (per curiam) for the proposition that a complete failure to authenticate is a defect in substance).

failure to authenticate a document is a defect of substance that makes the document "no competent evidence," and equating a complete failure to authenticate a document with conclusory statements in an affidavit); *Niu v. Revcor Molded Prods. Co.*, 206 S.W.3d 723, 729 (Tex. App.—Fort Worth 2006, no pet.) (holding that a complete failure to authenticate a document renders the document incompetent to raise a fact issue preventing summary judgment). Therefore, the memorandum and the diagram submitted by the HighMount Parties in response to the marketing-costs summary-judgment motion cannot raise a genuine fact issue.[8] *See Elizondo*, 415 S.W.3d at 264; *In re Estate of Guerrero*, 465 S.W.3d at 706–07; *Niu*, 206 S.W.3d at 729. Because the only evidence submitted by the HighMount Parties is substantively defective and incompetent, under the applicable standard of review, in response to the marketing-costs summary-judgment motion, the HighMount Parties did not raise a genuine, material fact issue sufficient to defeat summary judgment. *See Willrich*, 28 S.W.3d at 23–24. On this basis alone, the trial court did not err in granting this summary-judgment motion on the ground that the summary-judgment evidence proved as a matter of law that the DP6 compressors are not located downstream from a "central facility," as that term is defined in the Agreement.

---

[8] The Harrison Parties submitted another diagram of the DP6 facility in support of their marketing-costs summary-judgment motion. The Harrison Parties authenticated this diagram. Nonetheless, this diagram is materially different from the diagram that the HighMount Parties submitted. The Harrison Parties' diagram is difficult to read, does not contain the arrows, highlighting, and legend regarding "rich gas" and "lean gas" in the other diagram, and does not raise a genuine fact issue precluding summary judgment. *See Kings River Trail Ass'n v. Pinehurst Trail Holdings*, 447 S.W.3d 439, 445–47 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

## 4. *The Memorandum*[9]

In response to the Harrison Parties' summary-judgment motion regarding the deduction of marketing costs, the HighMount Parties submitted a two-page memorandum signed by an attorney-expert and a one-page diagram of the DP6 facility. In the memorandum, the attorney-expert states that the attorney for the HighMount Parties provided the attorney-expert with three schematics and a plat. The schematics and the plat are not attached to the memorandum or otherwise proved up in the summary-judgment evidence. The attorney-expert states that, based on the schematics and the plat, he "understand[s] the following concerning compression at DP6":

- All of the facilities at DP6 are located on the Subject Interests and were installed by the Producer after the Effective Time of the Agreement.

- Just "prior to" the compressors located at DP6, there are several separators that receive the full gas stream from a majority of Producer's wells located on the Subject Interests.

- "After and by compression" the separated gas stream is delivered to the Enterprise Products Operating LLC Pipeline on the Subject Interests.

- The separated gas stream then leaves the Subject Interests in the Enterprise Pipeline, which transmits and delivers the separated gas stream to a third-party processing plant.

In the memorandum, the attorney-expert states that the definition of "central facility" does not include the word "compressors" or "compression" and that "[t]herefore, based on the plain language of the Agreement, the compressors at DP6 are <u>not</u> part of a 'central facility,' but clearly downstream of a central

---

[9] Justice Christopher joins all of this opinion except for subsections 4 and 5 of Section II. B. of this opinion, which Justice Christopher does not join.

18

facility."[10]   The attorney-expert also states that it is his opinion that compression at DP6 falls within the definition of "Marketing Costs" because the compressors are downstream of a central facility to compress gas for delivery to the Enterprise Pipeline for transmission to a third-party processing plant.  Therefore, the attorney-expert opines that the Producer may deduct monthly marketing costs for such compression, not to exceed ten cents per MCF, in calculating the royalty payable to the royalty owners.   Each of these statements is a legal opinion or a legal conclusion that is incompetent to raise a genuine fact issue, even absent a ruling by the trial court on an objection to this effect.  *See Mercer v. Daoran Corp.*, 676 S.W.2d 580, 583 (Tex. 1984); *In re Estate of Guerrero*, 465 S.W.3d at 706–07; *Kastner v. Gutter Mgmt., Inc.*, No. 14-09-00055-CV, 2010 WL 4457461, at *8 (Tex. App.—Houston [14th Dist.] Nov. 4, 2010, pet. denied) (mem. op.).  The statements constitute no evidence.

The attorney-expert also states that the separators and associated meters at DP6 would constitute a central facility by the express terms of the Agreement because a majority of the production from the wells on the Subject Interests is delivered to DP6 for separation before delivery to a gas transmission line. The attorney-expert further says that after compression, the separated gas stream is delivered to the Enterprise Pipeline for transmission to a third-party processing plant. Even if there had not been a complete failure to authenticate the memorandum, under the applicable standard of review, neither these statements nor any other statement in the memorandum would raise a genuine fact issue as to whether the DP6 compressors are located downstream from a final set of heaters, separators, meters, and tanks that are operated as a unit and into which production

---

[10] The underlining is in the original.

from more than one oil or gas well on the Subject Interests is gathered for final treating and measurement before delivery to a gas transmission line owned or operated by a principal purchaser of gas in the Permian Basin.[11] *See Kings River Trail Ass'n v. Pinehurst Trail Holdings*, 447 S.W.3d 439, 445–47 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

### 5. *The Diagram*

On appeal, the HighMount Parties assert that there is a genuine fact issue as to whether the compressors for the "rich" gas stream in the DP6 facility are located downstream from a central facility.[12] In support of this argument, the HighMount Parties rely on the diagram of the DP6 facility that they attached to their summary-judgment response. This diagram is different from the diagram submitted by the Harrison Parties because it has highlighting, arrows, and a legend added to it in an attempt to show the flow of the "rich" gas, the flow of the "lean" gas, and the location of the compressors and other equipment. There is no summary-judgment evidence as to who created the diagram submitted by the HighMount Parties, nor is there any evidence explaining the various symbols on the diagram, including symbols that appear after what the diagram indicates is the flow of the "rich" gas

---

[11] In the memorandum, the attorney-expert states that he incorporates into the memorandum the contents of a prior memorandum. The HighMount Parties did not submit this prior memorandum in response to the marketing-costs summary-judgment motion, but they appear to have submitted the other memorandum in response to the summary-judgment motion that is the subject of the first appellate issue. Presuming without deciding that we may consider the other memorandum in determining whether a fact issue exists as to the marketing-costs motion, under the applicable standard of review, no statement in this memorandum raises a genuine fact issue as to whether the DP6 compressors are located downstream from a final set of heaters, separators, meters, and tanks that are operated as a unit and into which production from more than one oil or gas well on the Subject Interests is gathered for final treating and measurement before delivery to a gas transmission line owned or operated by a principal purchaser of gas in the Permian Basin.

[12] The HighMount Parties do not argue that the there is a fact issue as to whether the compressors for the "lean" gas stream in the DP6 facility are located downstream from a central facility.

through two compressors. Even if there had not been a complete failure to authenticate this diagram, under the applicable standard of review, in response to the marketing-costs summary-judgment motion, this diagram would not raise a genuine, material fact issue sufficient to defeat summary judgment. *See Willrich*, 28 S.W.3d at 23–24.

The trial court did not err in granting this summary-judgment motion on the ground that the summary-judgment evidence proved as a matter of law that the DP6 compressors are not located downstream from a "central facility," as that term is defined in the Agreement.[13] Accordingly, we overrule the HighMount Parties' second issue.[14]

## III. CONCLUSION

The trial court did not err in granting the Harrison Parties' summary-judgment motion on their claim that the HighMount Parties breached the Agreement by failing to pay the Harrison Parties royalties on gas used for fuel because the plain language of the Agreement entitles the Harrison Parties to royalties on the gross proceeds from gas used for fuel on the Subject Interests. Nor did the trial court err in granting summary judgment that the HighMount Parties breached the Agreement by deducting marketing costs based on the costs of the DP6 compressors because the summary-judgment evidence proved as a matter of law that the DP6 compressors are not located downstream from a "central facility,"

---

[13] Because we may affirm the trial court's summary judgment as to marketing costs on this ground, we need not and do not address the other summary-judgment grounds asserted by the Harrison Parties in this motion.

[14] The HighMount Parties have not assigned error or presented argument on appeal as to any challenge to the amount of damages, interest, or attorney's fees awarded by the trial court or to the trial court's rendition of a final judgment without a trial or summary-judgment rulings as to the amount of damages, interest, or attorney's fees that should be awarded. Therefore, these issues are not before this court.

as that term is defined in the Agreement.  We affirm the trial court's judgment.

/s/      Kem Thompson Frost
Chief Justice

Panel consists of Chief Justice Frost and Justices Christopher and Donovan. (Justice Christopher joins all of this opinion except for subsections 4 and 5 of Section II. B. of this opinion, which Justice Christopher does not join).