

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00271-CV

_____

BLUESTONE NATURAL RESOURCES II, LLC, Appellant

V.

WALKER MURRAY RANDLE; STETSON MASSEY, JR.; JO ANN RANDLE
MASSEY; SUNDANCE MINERALS, LP; DEBORAH LOU MARSHALL
SCHERER; MARSHALL SCHERER RANCH, LP; SHERRY E. MARSHALL
POMYKAL; MARSHALL POMYKAL RANCH, LP; ARDIS ELAINE MARSHALL;
NANCY PUTTEET FISH; GARY M. PUTTEET; JAMES CALHOUN LANGDON,
JR.; SANDRA WILSON LANGDON; JOSEPH STEADMAN LANGDON; AND
KAREN RAE LANGDON, Appellees

---

On Appeal from the 355th District Court
Hood County, Texas
Trial Court No. C2016258

---

Before Gabriel, Pittman, and Bassel, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

In this appeal's primary issue, we deal with a perennial struggle in Texas oil and gas law: Does the lessor or the lessee pay post-production costs (the processing and marketing costs of gas produced from a lease after the gas's extraction from the ground)? Appellant/Lessee characterizes the lease we interpret as "Frankenstein's Monster" with its parts cobbled together from the parts bin of oil and gas lease provisions. For this reason and others, Appellant urges that we must harmonize the terms of this unique creation to avoid having a perhaps inadvertently-included provision govern. Appellees'/Lessors' theme is that no matter its conception, we are bound by the language of the lease; that its terms dictate how to resolve conflicts in its language; and that any desire for a harmonious interpretation must give way to an obvious conflict between two of the lease's terms.

Our specific task of interpretation begins with a royalty provision contained in a printed form lease that placed the burden on Appellees to pay post-production costs. The complication is that the parties appended additional terms to the printed form, and Appellees argue that one of the terms in the addendum created a royalty measure that shifted the burden of post-production costs onto Appellant. We conclude that the printed and appended terms are contrary to each other and that the controlling provision is in the appended terms. This resolution places the burden of paying post-production costs on Appellant. Accordingly, we affirm.

## II. Procedural Background

The underlying litigation was originally brought in separate suits by various Appellees/Lessors. In the separate suits, Appellant and Appellees filed cross-motions for partial summary judgment that hinged on whether the provisions of the oil and gas leases at issue permitted Appellant to deduct post-production costs from royalty payments owed to Appellees. The parties entered into various stipulations regarding damages, depending on the trial court's summary-judgment ruling.

The trial court signed orders granting Appellees' motions for summary judgment, which decreed that the leases did not permit the deduction of post-production costs and that the deduction of these costs breached the leases. The trial court then signed interlocutory judgments that again concluded that the leases did not permit the deduction of post-production costs and that the deduction of these costs breached the leases at issue. The trial court found that two additional breaches had occurred from Appellant's failure to pay royalties on what the parties stipulated to be Plant Fuel and Compressor Fuel. The interlocutory judgments awarded damages in accord with the parties' stipulations. Finally, the interlocutory judgments awarded attorneys' fees through trial but reserved the issue of appellate attorney fees for determination in a separate judgment.

The parties next filed various agreed motions to consolidate, which the trial court granted. The trial court incorporated the interlocutory judgments into a

"Consolidated Final Judgment." The Consolidated Final Judgment also awarded appellate attorneys' fees. This appeal followed.

### III.  Lease Terms

Because the primary question before us is how to interpret two terms of an oil and gas lease, we set forth the key terms. This appeal involves twelve leases, but the parties agree that the terms at issue are virtually identical among those various leases.

Each lease has two components. The first component is a set of printed terms covering two pages. The second component is labeled "Exhibit 'A'" and also contains printed terms, which cover three pages. For ease of reference and for consistency with how the documents refer to themselves internally, we will refer to the two components as the Printed Lease and as Exhibit "A."[1]

One of the two terms at issue is in Paragraph 3 of the Printed Lease. That paragraph provides a royalty for gas produced from the leased properties in the following fashion:

> (b) on gas, including casinghead gas, or other gaseous substance produced from said land and sold or used off the premises or for the extraction of gasoline or other product therefrom, the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold by Lessee the market value shall not exceed the amount received by Lessee for such gas computed at the mouth of the well, and on gas sold at the well the royalty shall be one-eighth of the amount realized by Lessee from such sale . . . .

---

[1]We refer to all of these as Exhibit "A" despite the fact that some of the addenda are technically labeled "Exhibit B" because those are preceded by an exhibit containing a legal description of the leased premises.

4

One of the twelve leases has a slightly different form but still states a royalty valuation for gas sold by Appellant/Lessee as "the amount realized by [L]essee, computed at the mouth of the well."

The introductory paragraph in Exhibit "A" states, "It is understood and agreed by all the parties that the language on this Exhibit 'A' supersedes any provisions to the contrary in the printed lease hereof[.]" The other provision in controversy is Paragraph 26 of Exhibit "A." That provision states in whole as follows:

> LESSEE AGREES THAT all royalties accruing under this Lease (including those paid in kind) shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and otherwise making the oil, gas[,] and other products hereunder ready for sale or use. Lessee agrees to compute and pay royalties on the gross value received, including any reimbursements for severance taxes and production related costs.

### IV. Summary-Judgment Standard of Review

We apply a de novo standard of review to summary judgments. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). "When competing summary-judgment motions are filed, 'each party bears the burden of establishing that it is entitled to judgment as a matter of law.'" *Tarr v. Timberwood Park Owners Ass'n, Inc.*, 556 S.W.3d 274, 278 (Tex. 2018) (quoting *City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 356 (Tex. 2000)). "[I]f 'the trial court grants one motion and denies the other, the reviewing court should determine all questions presented' and 'render the judgment that the trial court should have rendered.'" *Id.*

5

## V. Guiding Rules of Construction for Oil and Gas Leases

"An oil and gas lease is a contract, and its terms are interpreted as such." *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005). "In construing an unambiguous oil and gas lease, . . . we seek to enforce the intention of the parties as it is expressed in the lease." *Id.* "We give terms their plain, ordinary, and generally accepted meaning[s] unless the instrument shows that the parties used them in a technical or different sense." *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996).

"We examine the entire lease and attempt to harmonize all its parts, even if different parts appear contradictory or inconsistent." *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002) (citing *Luckel v. White*, 819 S.W.2d 459, 461 (Tex. 1991)). A court examines all of the lease's provisions "because we presume that the parties to a lease intend every clause to have some effect." *Id.* (citing *Heritage Res.*, 939 S.W.2d at 121). Finally, we "cannot change the contract merely because we or one of the parties comes to dislike its provisions or thinks that something else is needed in it." *Arlington Surgicare Partners, Ltd. v. CFL Invs., LLC*, No. 02-15-00090-CV, 2015 WL 5766928, at *2 (Tex. App.—Fort Worth Oct. 1, 2015, no pet.) (mem. op.) (quoting *Cross Timbers Oil Co. v. Exxon Corp.*, 22 S.W.3d 24, 26 (Tex. App.—Amarillo 2000, no pet.)).[2]

---

[2]Parties may contend, or an appellate court may determine on its own, that a lease is ambiguous. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). The parties'

## VI. Overview of Royalty Provisions and the Allocation of Post-Production Costs

As noted in the introduction, one frequent source of conflict between lessors and lessees and the central conflict in this appeal is which party bears the costs of processing minerals once they are extracted from the ground, i.e., which party will bear the post-production costs. The unique terminology used to express the calculation of a royalty, especially a gas royalty, requires a description of the standard practice in allocating costs, the structure of a royalty clause, and the nuances in arcane oil and gas terminology that impact the question of the allocation of post-production costs.

At its most elementary level, a royalty is the landowner's share of production from a lease. *See U.S. Shale Energy II, LLC v. Laborde Props., L.P.*, 551 S.W.3d 148, 154 (Tex. 2018). Of course, there are costs both for bringing the minerals, such as oil and gas, to the surface and for processing those minerals once they are brought out of the ground. The issue of which party to a lease pays the post-production processing costs of gas is of greater moment than for the processing of oil:

> [U]nlike oil, which is typically sold to a refinery from storage tanks near the well and trucked to the refinery, the sale of gas involves substantial costs after the gas is brought to the surface. The gas must be

disagreement about a document's meaning does not make it ambiguous; ambiguity arises only if the document is subject to more than one reasonable interpretation. *Endeavor Energy Res., L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 601 (Tex. 2018). None of the parties in this appeal contend that the leases are ambiguous, and we do not conclude that they are.

compressed, processed, and transported to a market hub. Those operations are often expensive[] but usually increase the value of the gas.

Joseph Shade & Ronnie Blackwell, *Primer on the Texas Law of Oil & Gas*, 59 (5th ed. 2013).

In Texas, a royalty is free of the expenses of production—the expenses of bringing it to the surface. *Chesapeake Expl., L.L.C. v. Hyder*, 483 S.W.3d 870, 872 (Tex. 2016) (op. on reh'g) (*Hyder II*) (citing *Heritage Res.*, 939 S.W.2d at 121–22); *Chesapeake Expl., L.L.C. v. Hyder*, 427 S.W.3d 472, 480 (Tex. App.—San Antonio 2014) (*Hyder I*), *aff'd*, 483 S.W.3d 870 (Tex. 2016). The contrary is true of the costs incurred once the minerals reach the surface, and the "royalty is usually subject to post-production costs, including taxes, treatment costs to render it marketable, and transportation costs." *Heritage Res.*, 939 S.W.2d at 122. As with any contract, the parties may modify the general rule that the lessor bears the post-production costs. *Hyder II*, 483 S.W.3d at 872; *Heritage Res.*, 939 S.W.2d at 122.

To try to bring some order to our review of how the leases at issue dealt with post-production costs, we begin with a brief description of royalty clauses. One commentator has superimposed a structure on royalty clauses and described the clauses as commonly having the mechanics of "at least three components: (i) the royalty fraction—e.g., 1/8th, 25%, 1/5th; (ii) the yardstick—e.g., market value, proceeds, price; and (iii) the location for measuring the yardstick—e.g., at the well, at the point of sale." Byron C. Keeling, *In the New Era of Oil & Gas Royalty Accounting:*

*Drafting a Royalty Clause That Actually Says What the Parties Intend It to Mean*, 69 Baylor L.

Rev. 516, 520 (2017). This appeal focuses on the second and third components.

The second component—establishing "the yardstick"—may create a payment

measure that looks to an outside source, such as a market value, or may simply reflect

what was received in payment for the minerals, i.e., the proceeds of the sales of the

minerals. *Bowden v. Phillips Petroleum Co.*, 247 S.W.3d 690, 699 (Tex. 2008). The

supreme court has provided a succinct description of the two measures:

> "Proceeds" or "amount realized" clauses require measurement of the
> royalty based on the amount the lessee in fact receives under its sales
> contract for the gas. *Union Pac. Res.* [*Grp.*] *v. Hankins*, 111 S.W.3d 69, 72
> (Tex. 2003) (citing *Yzaguirre* [*v. KCS Res., Inc.*], 53 S.W.3d [368,] 372
> [(Tex. 2001)]). By contrast, a "market value" or "market price" clause
> requires payment of royalties based on the prevailing market price for
> gas in the vicinity at the time of sale, irrespective of the actual sale price.
> *Yzaguirre*, 53 S.W.3d at 372. The market price may or may not be
> reflective of the price the operator actually obtains for the gas. *Id.* at
> 372–73.

*Bowden*, 247 S.W.3d at 699; *see Burlington Res. Oil & Gas Co. LP v. Tex. Crude Energy,*

*LLC*, No. 17-0266, 2019 WL 983789, at *4 (Tex. Mar. 1, 2019) (discussing "proceeds"

or "amount realized" yardstick).[3]

Because of its complexity, we will look first at the market-value yardstick. One

method of making the market-value determination relies on comparable sales, looking

for sales that are "comparable in time, quality, quantity, and availability of marketing

---

[3]*Burlington Resources* was handed down after this case was submitted, but both
Appellant and Appellees filed post-submission letter briefs addressing the effect of
this new case on their positions on appeal.

outlets." *Heritage Res.*, 939 S.W.2d at 122. Lessees seldom use the comparable-sales method because of a lack of data to make the calculation that measure requires. Keeling, *supra*, at 531.

Instead, "[m]ost lessees use a different methodology for calculating their royalty payments—the 'workback method,' which permits them to calculate the value of their production at the wellhead by subtracting post-production costs from the price that they receive for their production at a downstream sales location." *Id.* Or as the supreme court described the alternate methods of calculation: "Evidence of market value is often comparable sales, . . . or value can be proven by the so-called net-back approach, which determines the prevailing market price at a given point and backs out the necessary, reasonable costs between that point and the wellhead." *Heritage Res.*, 939 S.W.2d at 130 (Owen, J., concurring).[4]

The third component of the royalty mechanism—the location for measuring the yardstick—is a vital part of the royalty calculation. It establishes the point from which a lessee works back to determine market value. Keeling, *supra*, at 530–32. The third component does this by setting the point along the process from production to sale where the value determination is made. *Id.* at 524. Determining this location is pivotal because of the process of gas becoming more valuable as it moves away from the point where it was extracted from the ground (the wellhead) to a point

[4]Because Justice Owen's concurring opinion in *Heritage Resources* became the plurality opinion of the Texas Supreme Court on rehearing, we will cite her concurrence as if it were the plurality opinion. *See Hyder II*, 483 S.W.3d at 875 & n.25.

10

downstream in the refining process and eventually to its sale. *Id.* at 524–25. To elaborate on the point we made initially, moving away from the wellhead adds value; thus, "[o]il and gas production is less valuable at the wellhead because any arm's length purchaser will assume that it will have to incur the cost to remove impurities from the production, to transport it from the wellhead, or otherwise to get it ready for sale to a downstream market or the general public." *Id.*

Tying the allocation of post-production costs to a point set between production and sale creates the potential for unpleasant surprises for lessors. Contrary to what a drafter unschooled in the nuances of oil and gas law might think, a lease usually does not express the allocation by saying that one party or another will or will not pay the post-production costs. Indeed, as discussed below, a provision making that simple statement may be interpreted as empty words when inserted in a royalty clause that expresses the allocation of costs in more traditional oil and gas jargon.

A traditional expression—that requires the lessor to bear all the post-production costs—places the third component (that establishes the location for measuring the yardstick) "at the well." *Id.* at 530–32. Thus, if market value is the yardstick, the point of measuring the yardstick is "market value at the well," which has a commonly accepted meaning. *Heritage Res.*, 939 S.W.2d at 122. This measure places the burden of paying post-production costs on the lessor because gas that has just emerged from the ground has not yet been "transported, treated, compressed, or

11

otherwise prepared for market," and the market value at the well does not include the value added by those yet-to-occur processes. *Id.* at 130. The lessee recoups its expenses by working back the value from the amounts received in payment for the minerals, with the lessor's royalty payment being the amount that the lessee received from the sale of the minerals net of all the expenses incurred by the lessee from the point that the minerals emerged from the ground to the point that they were sold. Keeling, *supra*, at 531–32. In other words, the lessor bears the burden of post-production costs because the lessee deducts those costs from the price it receives and remits to the lessor the amount received net of the amount of the post-production costs. *Judice v. Mewbourne Oil Co.*, 939 S.W.2d 133, 135 (Tex. 1996) ("[Market value at the well] means value at the well, net of any value added by compressing the gas after it leaves the wellhead.").[5]

---

[5]The supreme court recently summarized this process of net-back post-production expenses as follows:

> The question of how to allocate post-production costs can arise when the sale used to calculate the royalty payment is downstream from the point at which the royalty interest is valued. If the royalty is valued at the well but the sale takes place after the product has been processed and transported, the product sold is generally of greater value than the product in which the royalty holder has an interest. In this situation, the sales price must be adjusted to properly calculate the royalty payment. Courts have recognized that one way to make this adjustment is to subtract the costs of bringing the product to the market (the post-production costs) from the sales price obtained at the market.

*Burlington Res.*, 2019 WL 983789, at *4 (citations omitted).

Because of the nuances in expressing the allocation of post-production costs, there is sometimes a "night-is-day" feeling to the results in interpreting royalty clauses. We noted above that inserting a statement in a lease to specify who will or will not bear the post-production costs may have no effect. Blindly inserting a provision that states no post-production costs shall be deducted from the value of the lessor's royalty in juxtaposition to a provision that sets the valuation yardstick "at the well" is an exercise in futility. As one commentator noted, in leases that provide for the net-back of post-production expenses, "there are times when the express language of the lease may contain conflicting or inconsistent signals." Patrick H. Martin & Bruce M. Kramer, 6 *Williams & Meyers Oil & Gas Law*, § 645.2 at 614.8(1) (2018 ed.).

The supreme court explained this interpretive twist in *Heritage Resources*. 939 S.W.2d at 120. The royalty clause in *Heritage Resources* set the yardstick at the market value of the gas produced from the lease and the point where to measure the yardstick at the well. *Id.* at 120–21. But the royalty provision also included a statement—often referred to as a "no-deductions clause"—that on its face appeared to say that the lessor would not be charged post-production costs: "[T]here shall be no deductions from the value of lessor's royalty by reason of any required processing, costs of dehydration, compression, transportation, or other matter to market such gas." *Id.* at 121.

The quoted provision was not enough to put the genie back into the bottle and save the lessor from the commitment in the first portion of the royalty clause to have

13

the market value of the royalty measured at the well, with its corresponding commitment to allow the lessee to net-back post-production costs it had incurred between the well and the point of sale of the gas. *Id.* at 130–31. The additional phrase did not conflict with the "at the well" royalty formulation or render the clause ambiguous; the "no deduction of post-production expenses" clause simply meant nothing. *Id.* In the supreme court's view, the appended phrase was surplusage:

> As long as "market value at the well" is the benchmark for valuing the gas, a phrase prohibiting the deduction of post-production costs from that value does not change the meaning of the royalty clause. Thus, even if the Court were to hold that a lessee's duty to market gas includes the obligation to absorb all of the marketing costs, the proviso at issue would add nothing to the royalty clause. All costs would already be borne by the lessee. It could not be said under that circumstance that the clause is ambiguous. It could only be said that the proviso is surplusage.

*Id.*[6]

---

[6]A federal court summarized the *Heritage Resources* surplusage holding as follows:

> The *Heritage* [*Resources*] court held that the "no deductions" clauses were not in conflict with the royalty provisions. The deduction of post-production costs incurred between the wellhead and a downstream point at which market value could be ascertained was nothing more than a method of determining market value at the well in the absence of comparable sales data at or near the wellhead. The value of the gas, and therefore the value of the royalty, was not reduced. As the concurring opinion stated, "[T]he concept of 'deductions' of marketing costs from the value of the gas is meaningless when gas is valued at the well. Value at the well is already net of reasonable marketing costs."

*Potts v. Chesapeake Expl., L.L.C.*, 760 F.3d 470, 475 (5th Cir. 2014) (citing *Heritage Res.*, 939 S.W.2d at 130).

14

Though the no-deductions clause in *Heritage Resources* meant nothing, that does not mean that a lessor cannot find language to shift the burden for post-production costs to the lessee. As noted, the supreme court has acknowledged that the parties may agree to allocate the post-production costs however they wish. *Hyder II*, 483 S.W.3d at 872; *Heritage Res.*, 939 S.W.2d at 122. The parties can specify a different point to measure the yardstick and place the point of valuation further down the path from production to sale. *Heritage Res.*, 939 S.W.2d at 131 ("If [the parties] had intended that the royalty owners would receive royalty based on the market value at the point of *delivery or sale*, they could have said so.").

Another method a lessor may use to avoid the burden of post-production expenses is to specify a different yardstick than market value. When we first described the second component of the royalty clause, we noted that one of the other yardsticks that could be used to measure the royalty was proceeds. *See* Keeling, *supra*, at 521–22. By specifying the yardstick of the amount the lessee actually receives, the royalty provision may also remove the lessee's ability to net the post-production expenses out of the payment it makes to the lessor. *Hyder II*, 483 S.W.3d at 873. To make our own contribution to the jargon of royalty measures, we will refer to this as a pure-proceeds measure.

One example using this simplified mechanism/pure-proceeds measure specifies that the lessee receives a percentage share "of the price actually received" by the lessor. *Id.* at 871. The supreme court described the effect that this measure has

15

on the allocation of post-production costs as follows: "Often referred to as a 'proceeds lease,' the price-received basis for payment in the lease is sufficient in itself to excuse the lessors from bearing postproduction costs." *Id.* As a federal court interpreting a royalty clause also noted, one method for a lessee to shift the burden of paying post-production costs is to say "in the addendum that the lessor was entitled to 22.5% of the actual proceeds of the sale, regardless of the location of the sale." *Warren v. Chesapeake Expl., L.L.C.*, 759 F.3d 413, 418 (5th Cir. 2014). The supreme court recently summarized how a proceeds-based measure may affect the allocation of post-production costs: "This Court and other courts have recognized that an agreement to value a royalty interest based on the 'amount realized,' or similar language, can grant the royalty holder the right to a percentage of the sale proceeds with no adjustment for post-production costs." *Burlington Res.*, 2019 WL 983789, at *4.[7]

---

[7]The supreme court in *Burlington Resources* substantiated the quoted statement by referencing its holding in *Hyder II* as follows:

> The majority opinion in *Hyder* stated that a royalty provision giving lessors 25% of "the price actually received by Lessee" disallowed deduction of postproduction expenses because "it is based on the price [lessee] actually received for the gas through its affiliate, Marketing, after postproduction costs have been paid" and because "*the price-received basis for payment in the lease is sufficient in itself to excuse the lessors from bearing postproduction costs.*" 483 S.W.3d at 871, 873.

*Burlington Res.*, 2019 WL 983789, at *4 (emphasis added).

16

But a location for measuring the yardstick can also be superimposed on the proceeds measure. Specifically, the addition of the words "at the well" to a proceeds measure reverses course and restores the burden of post-production costs to its traditional place in the lessor's column. The supreme court recently (and succinctly) made the point that it has "never held that an 'amount realized' valuation method frees a royalty holder from its usual obligation to share post-production costs even when the parties have agreed to value the royalty interest at the well." *Id.* at \*5. The "at the well" valuation point controls the allocation of post-production costs, apparently, no matter the underlying yardstick as noted by the supreme court:

> We have never construed a contractual "amount realized" valuation method to trump a contractual "at the well" valuation point. To the contrary, prior decisions suggest that when the parties specify an "at the well" valuation point, the royalty holder must share in post-production costs regardless of how the royalty is calculated.

*Id.* (citing *Warren*, 759 F.3d at 417–18; *Judice*, 939 S.W.2d at 136; *Heritage Res.*, 939 S.W.2d at 123).[8]

---

[8]*See also L.B. Hailey L.P. v. Encana Oil & Gas (USA) Inc.*, No. 5:17-cv-00149-RCL, 2018 WL 3150691, at \*5 (W.D. Tex. June 27, 2018) (mem. op.) (holding that once a royalty clause sets an "at the well" valuation, the lease must have language to "sufficiently circumvent" that valuation point to alter the allocation of post-production costs). The court in *Encana Oil* stated,

> As in *Hyder* [*II*] and *Heritage* [*Resources*], the text of the royalty clause speaks for itself: the point of valuation is the wellhead, so post-production costs must be deducted from the royalty to reach the proper amount from which to calculate the royalty. These positions are reinforced by identical interpretations of Texas state law by the Fifth Circuit in *Warren* and *Potts*. None of the clauses in 3(d) sufficiently

17

But to take the interpretive process fully down the rabbit hole, there may be documents that state both a pure-proceeds measure and another value tied to an "at the well" measure. Then, the measures of royalty contradict one another. *See Judice*, 939 S.W.2d at 136. The supreme court has highlighted that an instrument using the term "gross proceeds" is at odds with "at the well" language and with its mechanism to place the burden of post-production costs on the lessee: "The term 'gross proceeds' means that the royalty is to be based on the gross price received by [Lessee] Mewbourne. The use of the term 'at the well' indicates just the opposite, that the royalty is to be based on its value 'at the well.'" *Id.*; *see also Heritage Res.*, 939 S.W.2d at 130 (stating that court was not presented with a clause similar to the one at issue in *Judice* in which "a division order directed royalties to be based on 'gross proceeds realized at the well,'" and that there is an "inherent, irreconcilable conflict between 'gross proceeds' and 'at the well' in arriving at the value of the gas," which is a "conflict [that] renders the phrase ambiguous").

## VII. Appellees'/Lessors' Royalty Is Not Burdened with Post-Production Costs

In its first issue, Appellant argues that the unambiguous leases allow for the deduction of post-production costs. Thus, our discussion up to this point has not been purely academic. Instead, it gives context to Appellant's and Appellees' themes

---

circumvent the "at the wellhead" royalty valuation of 3(b)(1)—they are "simply ineffective."

*See id.*

18

in this appeal. To elaborate on the themes described above, Appellant's theme is one of harmony, arguing that we must view the various provisions at issue from a starting point that Paragraph 3 of the Printed Lease creates a market-value-at-the-well measure for Appellees' gas royalty—a measure that no one disputes saddles Appellees with the post-production expenses. With this baseline, and driven by the goal of a harmonious interpretation, Appellant argues that the terms in Paragraph 26 of Exhibit "A" attached to the Printed Lease do not alter—but rather are "baked into," as Appellant calls it—this yardstick of royalty valuation.

Appellees' theme is conflict. They argue that the provisions of the Printed Lease and Exhibit "A" irreconcilably contradict each other because one embodies a market-value-measured-at-the-well yardstick and the other a pure-proceeds yardstick. In the event of a conflict between the documents, Exhibit "A" commands that its terms supersede those of the Printed Lease. In Appellees' view, Exhibit "A's" pure-proceeds measure controls and so burdens Appellant with the post-production expenses.

With those themes as a backdrop, our analysis will progress as follows:

- The Printed Lease creates an "at the well" royalty yardstick and measure;

- Exhibit "A" attached to the Printed Lease provides that when the terms of the two documents are contrary to the other, Exhibit "A" supersedes, and the lack of a specific direction in Paragraph 26 that it controls in the

event of a conflict is not necessary to give that paragraph a superseding effect if it conflicts with the royalty provision of the Printed Lease;

- The test to determine whether the terms of the Printed Lease and Exhibit "A" are contrary to each asks whether the terms of each are so inconsistent they cannot subsist together;

- Paragraph 26 as a whole creates a pure-proceeds measure of royalty, which is contrary to the Printed Lease's "at the well" measure, and thus Exhibit "A" supersedes;

- The failure of Paragraph 26 to specifically alter the point of sale does not prevent it from superseding the different royalty measure in Paragraph 3;

- The El Paso court's opinion in *SandRidge*,[9] at first blush, may appear to conflict with our analysis, but it does not address the specific arguments we resolve; and

- Paragraph 26 cannot be read as a backstop provision to deal with disparities between the market price of gas and the price for which gas is sold under long-term contracts.

---

[9]*Comm'r of Gen. Land Office of State v. SandRidge Energy, Inc.*, 454 S.W.3d 603 (Tex. App.—El Paso 2014, pets. denied).

20

**A. We set forth the Lease Provisions and their effect on the royalty determination.**

**1. The Printed Lease establishes a market-value-at-the-well royalty yardstick.**

No one disputes that the measure of royalty is created by Paragraph 3 of the Printed Lease. That paragraph provides in relevant part that the royalty on gas is "the market value at the well of one-eighth of the gas so sold or used." Breaking down the royalty clause into the components described above, (1) the Appellees'/Lessors' fractional share of the production is 1/8, (2) the yardstick of the valuation is market value, and (3) the location for measuring the yardstick is "at the well."[10] On its own, Paragraph 3 states the classic formulation that permits a lessee to net-back the post-production expenses it incurs between the well and the point of sale of the gas. In other words, the Appellees/Lessors bear those expenses under Paragraph 3.

**2. The first sentence of Paragraph 26 of Exhibit "A" in isolation duplicates the no-deduction clause that the Texas Supreme Court has held to be surplusage.**

The first sentence of Paragraph 26 provides, "LESSEE AGREES THAT all royalties accruing under this Lease (including those paid in kind) shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing,

---

[10]The specific Exhibit "*A*s" increase the fractional share by which the royalty is calculated.

separating, treating, dehydrating, compressing, processing, transporting, and otherwise making the oil, gas[,] and other products hereunder ready for sale or use."

This sentence, again in isolation, ties itself to the "royalties accruing under this lease." At this point in the analysis, the royalty accruing under the lease is the market-value-at-the-well analysis set out in Paragraph 3 of the Printed Lease. The language that comes after the phrase "accruing under this lease" is almost a duplicate of the no-deductions clause—"there shall be no deductions from the value of Lessor's royalty by reason of any required processing, costs of dehydration, compression, transportation, or other matter to market such gas"—that the supreme court in *Heritage Resources* held was surplusage. 939 S.W.2d at 130–31. Again, this language is surplusage because it does not change the meaning of the "at the well" valuation point. Appellees' counsel agreed during oral argument that if the terms had ended with the first sentence of Paragraph 26, the Appellees/Lessors would be subject to a market-value-at-the-well royalty and thus burdened with the payment of post-production costs.

### 3. But we must consider whether the second sentence of Paragraph 26 changes the foregoing conclusions.

This case turns on the impact of the second sentence of Paragraph 26 of Exhibit "A." That sentence provides, "Lessee agrees to compute and pay royalties on the gross value received, including any reimbursements for severance taxes and production related costs." Thus, we next focus on this sentence's place in the mix of

22

terms in the Printed Lease and Exhibit "A" and examine (1) why we construe it to create a pure-proceeds yardstick for royalty valuation and (2) why it sets the measure of royalty between the parties.

**4.  The introductory paragraph of Exhibit "A" establishes that its terms supersede contrary provisions of the Printed Lease.**

The first battle line in the parties' themes of harmony and conflict involves Exhibit "A" and how it resolves conflicts between its terms and those of the Printed Lease.  We will examine the terms referenced by the parties and how the arguments parsing the terms have evolved during the briefing of this appeal.  But at the end of the day, we construe Exhibit "A" to provide that if any of its terms are contrary to those of the Printed Lease, Exhibit "A" supersedes.  With that guidance in mind, we will then address the question of whether Paragraphs 3 and 26 are contrary to each other.

The introductory paragraph of Exhibit "A" states that the Exhibit is attached to and made a part of the Printed Lease.  It then states, "It is understood and agreed by all parties that the language on this Exhibit 'A' supersedes any provisions to the contrary in the printed lease hereof[.]"

Appellees rely on the breadth of this sentence and interpret it as a self-contained instruction that the language of Exhibit "A" supersedes "any" provisions of the Printed Lease when provisions in the two documents are contrary to each other.  In Appellees' view, we need not look at any other provisions of Exhibit "A" for

23

instruction on how to resolve a conflict between that Exhibit and the Printed Lease because it has already directed that it supersedes in "any" conflict created between the contrary terms of the documents.[11]

Appellant counters that Exhibit "A" states additional requirements that must be met before its terms supersede. Appellant relies on the fact that specific paragraphs in Exhibit "A" begin with the phrase "ANYTHING HEREIN TO THE CONTRARY notwithstanding." In Appellant's view, these specific paragraphs carry the consequence that "[w]here the parties to the Leases intended a numbered paragraph in the addendum to amend and supersede a specific provision in the preprinted portion, they did so consistently and unambiguously by starting the paragraph with the phrase 'ANYTHING HEREIN TO THE CONTRARY notwithstanding.'"

Appellees' rejoinder is that the inference Appellant draws from the "Anything Herein" paragraphs is absurd, and Appellees counter by pointing out that the purpose of the "Anything Herein" references deals not only with conflicts between the Printed Lease and Exhibit "A" but also with internal conflicts within Exhibit "A." Appellees go further and point to paragraphs in Exhibit "A" that obviously conflict with the Printed Lease but do not begin with the "Anything Herein" phrase. Their final

---

[11]Appellees argue as follows: "To accept [Appellant's] argument, the [c]ourt would have to ignore the word 'any' or rewrite the Addendum to limit the unlimited plain meaning of 'any' to [certain paragraphs in Exhibit 'A']. [Appellant] violates fundamental contract construction rules." *See Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 239 (Tex. 2016).

rejoinder is that there is even a paragraph in Exhibit "A" that begins with "[n]otwithstanding any other provisions . . . to the contrary," but it does not conflict with any provisions of the Printed Lease.

In its reply brief, Appellant challenges the particular lease form that Appellees selected to make their points in the prior paragraph because Appellant claims that the form is not a representative sample of the terms of the various Exhibit "*A*s." But after challenging the form of Exhibit "A" that Appellees highlight, Appellant presses the argument only to the extent of saying that the issue is not dispositive or particularly significant, and "at the end of the day, the issue is whether the relevant provisions can be harmonized, and they can."[12]

We conclude that the instruction in the introductory paragraph of Exhibit "A"—that its language "supersedes any provisions to the contrary in the printed lease hereof"—is not diminished by the absence of an "Anything Herein" phrase in its Paragraph 26. The use of the "Anything Herein" phrase is not used with such consistency that we can be guided by its presence or absence in a paragraph. *See*

---

[12]We note that there are variations between the Printed Lease and Exhibit "A" other than those highlighted by Appellees that are contained in paragraphs that do not begin with the "Anything Herein" phrase. Examples include the following: (1) the Printed Lease in Paragraph 3 provides for pooled gas units of 640 acres, but Exhibit "A" in Paragraph 13 provides for pooling units of 160 acres; (2) the time that continuous operations may hold the lease in Paragraph 5 of the Printed Lease appears to be changed by Paragraph 13 of Exhibit "A"; (3) the time that Lessee may recover its property specified in Paragraph 6 of the Printed Lease appears to be modified by Paragraph 39 of Exhibit "A"; and (4) Paragraph 6 of the Printed Lease requires pipelines to be buried "below ordinary plow depth," but Paragraph 32 of Exhibit "A" requires a depth of thirty inches.

*Lavaca Bay Autoworld, L.L.C. v. Marshall Pontiac Buick Oldsmobile*, 103 S.W.3d 650, 659 (Tex. App.—Corpus Christi–Edinburg 2003, no pet.) ("[W]hen differences exist between terms in the same instrument, those that contribute most essentially to the agreement are entitled to greater consideration."); *Caranas v. Morgan Hosts–Harry Hines Blvd., Inc.*, 460 S.W.2d 225, 228 (Tex. App.—Dallas 1970, no writ) (same). The introductory phrase's plain language requires that we compare the terms in Paragraph 3 in the Printed Lease with the terms in Paragraph 26 in Exhibit "A," determine if they are "contrary" to each other, and implement the instruction to have the terms in Exhibit "A" supersede if they are contrary. *See Heritage Res.*, 939 S.W.2d at 121.

**5. We adopt Appellant's test for deciding whether the terms in the Printed Lease's Paragraph 3 are contrary to the terms in Exhibit "A's" Paragraph 26.**

In deciding whether Paragraph 3 of the Printed Lease conflicts with Paragraph 26 of Exhibit "A," we rely on the test advocated by Appellant. Again, Exhibit "A" states that it "supersedes any provisions to the contrary in the printed lease hereof." Appellant urges us to focus on the word "contrary" in the provision and cites cases instructing that a conflict between terms exists "when terms of one contract are so inconsistent with those of the other that the two cannot subsist together[, and] there is a presumption that the second [contract] superseded the first." *See Saturn Capital Corp. v. Dorsey*, No. 01-04-00626-CV, 2006 WL 1767602, at *4 (Tex. App.—Houston [1st Dist.] June 29, 2006, pet. denied) (mem. op.) (quoting *IP*

*Petroleum Co. v. Wevanco Energy, L.L.C.*, 116 S.W.3d 888, 899 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) (op. on reh'g)); *see also Allen Drilling Acquisition Co. v. Crimson Expl. Inc.*, 558 S.W.3d 761, 773 (Tex. App.—Waco 2018, pet. filed) (op. on reh'g) (same).

Appellees urge us to also note the effect a superseding clause may have, such as when a document states that it supersedes a previously executed document or if it specifies that one document is given effect in the event of a conflict. *See Albert v. Dunlap Explr., Inc.*, 457 S.W.3d 554, 563–64 (Tex. App.—Eastland 2015, pet. denied); *Helmerich & Payne Int'l Drilling Co. v. Swift Energy Co.*, 180 S.W.3d 635, 643 (Tex. App.—Houston [14th Dist.] 2005, no pet.). But the introductory paragraph of Exhibit "A" does not give sway to its provisions because they are later in time. Instead, it gives sway only when its provisions are contrary to those of the Printed Lease.

Thus, whether we rely on the general principle to determine if provisions conflict or the standard set by the introduction of Exhibit "A," our task remains the same—to determine whether the provisions of Paragraph 3 and Paragraph 26 are "so inconsistent with those of the other that the two cannot subsist together."

**6. The royalty measure in Exhibit "A's" Paragraph 26 supersedes the one found in Printed Lease's Paragraph 3 because those provisions are contrary to one another.**

The next line of battle between harmony and conflict is the decisive one. Appellant's strategy is to analogize Exhibit "A's" Paragraph 26 to the supreme court's

holding in *Heritage Resources* and to characterize that paragraph as a no-deductions clause that simply reiterates the already-stated yardstick measure of an "at the well" royalty valuation found in the Printed Lease's Paragraph 3. This, in Appellant's view, makes Paragraph 26 surplusage. Reinforcing that theme, Appellant ensured that we were aware of the supreme court's recent opinion in *Burlington Resources*, with emphasis on that opinion's holding that the "at the well" valuation point is a "trump" that creates the traditional allocation of post-production costs even when applied to a proceeds measure in the absence of a conflict-control provision like the one here. *See Burlington Res.*, 2019 WL 983789, at *5. Appellees' counter-strategy focuses on the last sentence of Paragraph 26 and construes that sentence to create a freestanding pure-proceeds royalty measure—a measure that, as noted above, is in contradiction to a market-value-at-the-well yardstick.

Resolving this conflict presents two questions. Does the second sentence of Paragraph 26 establish a pure-proceeds yardstick for royalty valuation? It does. Is that measure in Paragraph 26 contrary to the measure in Paragraph 3 of the Printed Lease such that Paragraph 26 supersedes Paragraph 3? It is.

The second sentence of Paragraph 26 provides that "Lessee agrees to compute and pay royalties on the gross value received." Appellees provide the following construction of these words:

> The Gross Value Received Clause in Paragraph 26 of the Addendum unambiguously requires BlueStone to calculate Lessors' royalties on the "gross value received." . . . "Gross" means "[u]ndiminished by

28

deduction, entire." *Hyder* [*II*], 483 S.W.3d at 873 (quoting Black's Law Dictionary 818 (10th ed. 2014)). Under Texas law, "gross value received" means the value actually received by lessee, including proceeds at the point of sale—without deductions for post-production costs. *See Heritage* [*Res.*], 939 S.W.2d at 121; *Hyder* [*II*], 483 S.W.3d 870; *Judice v. Mewbourne Oil Co.*, 939 S.W.2d 133, 135 (Tex. 1996).

This construction is a reasonable one and creates a proceeds yardstick for royalty valuation. Indeed, the supreme court in *Judice* noted in simple terms that "[t]he term 'gross proceeds' means that the royalty is to be based on the gross price received by [the owner of the working interest]." 939 S.W.2d at 136. And as Appellees noted, *Hyder II* also looked to the use of the word "gross" and found that its presence indicated a measure that did not require deductions. *See Hyder II*, 483 S.W.3d at 873.[13]

And Appellant never tells us why the three words—gross value received— mean something other than what Appellees contend that they mean. Indeed, in one of its briefs, Appellant states that "[t]he 'gross value received' at the point of sale

---

[13]One commentator described *Hyder II*'s holding as follows:

> While admitting that the royalty clause language in this case is not as clear as in *Heritage Resources* in that no point of valuation is mentioned at all in paragraph 10 and there is no express language relating to deductions, the court focused its attention on two matters—the use of the term "gross" to modify "production" and the exclusion of production taxes. As with many overriding royalty interests not only is there no defined point of valuation, but there is no express language stating whether the royalty obligation is a delivery or payment obligation. The court said that the reference to gross production evinced an intent that there not be deductions in addition to the volumes being measured at the well.

Martin & Kramer, *supra*, § 645.2 at 614.13.

includes everything [Appellant] received at that point of sale, 'including any reimbursements for severance taxes and production related costs.'" Thus, the interpretive conflict is not on what the words "gross value received" mean in isolation. Instead, Appellant focuses on how the words (1) should not alter the royalty measure established by Paragraph 3 of the Printed Lease, (2) have been held to be surplusage by another court, and (3) are a protective measure that addresses disparities between the market value of gas and the price for which it is sold under long-term contracts.

Thus, the Printed Lease contains—as all agree—a market-value-at-the-well royalty yardstick. Paragraph 26 of Exhibit "A" contains a pure-proceeds royalty yardstick. These royalty measures are contrary to each other; as stated by the supreme court, "There is an inherent, irreconcilable conflict between 'gross proceeds' and 'at the well' in arriving at the value of the gas." *See Heritage Res.*, 939 S.W.2d at 130. The introductory paragraph of Exhibit "A" tells us how to resolve that conflict by directing that its terms supersede.

**B. We reject Appellant's argument that attempts to avoid the effect of Paragraph 26's pure-proceeds measure.**

**1. No rule of super clarity required the parties to specify a particular point of sale when they selected a pure-proceeds royalty yardstick.**

Appellant argues that once an "at the well" measure is baked into the royalty provision, it requires super clarity in any provision that attempts to alter its effect. We construe this argument to mean that once a royalty provides an "at the well" point of

30

valuation, a lease can alter that scheme of valuation only by clearly altering its terms to provide a different point of valuation, such as by striking the words "at the well" when they appear in a lease.

Appellant's argument has crystalized further after the supreme court's opinion in *Burlington Resources* and its description of the "at the well" point of valuation as a "trump." Appellant summarizes the issue and its position on how the issue should be resolved:

> Given *Burlington Resources*'s emphasis on the point of valuation, the critical question for this [c]ourt in construing the [l]eases is whether "gross value received" in [P]aragraph 26 of the addendum supersedes not just the "market value" pricing method in [P]aragraph 3 but also the "at the well" point of valuation in [P]aragraph 3. Paragraph 26 is silent as to the point of valuation. It does not say "at the point of sale" or anything else regarding the point of valuation. This [c]ourt should construe the Leases to leave [P]aragraph 3's "at the well" point of valuation in place and allow for deduction of post-production costs.

The reason that Appellant offers for leaving Paragraphs 3's point of valuation in place is that Paragraph 26 does not explicitly state a point of valuation, and this absence means that Paragraph 3's point of valuation must remain operative.

This argument has force. Paragraph 26 of Exhibit "A" does not explicitly delete Paragraph 3's specific "at the well" point of valuation or explicitly state a new point of valuation. And we agree that *Burlington Resources* contains a clear lesson on the power of an "at the well" valuation point to control the allocation of post-production costs, no matter whether the yardstick utilized is market value or pure proceeds. *See Burlington Res.*, 2019 WL 983789, at *5.

31

But Exhibit "A" states that it supersedes when the provisions are contrary to the Printed Lease. In our view, Paragraph 3 and Paragraph 26 are inherently contrary to each other: one contains an "at the well" measure, and one does not because it contains a proceeds measure not tied to a particular point of sale—what we have termed a pure-proceeds measure.

At its most elementary level, we would not be giving Paragraph 26 superseding effect if we held that Paragraph 26 meant the same thing as the provision with which it conflicts, i.e., the "at the well" measure in Paragraph 3. Further, to accomplish what Appellant wants, we would have to import words from Paragraph 3 into Paragraph 26 because the latter paragraph does not contain an "at the well" valuation measure. In other words, we do not see how we would be giving Exhibit "A" its controlling role if we were to cut and paste the words "at the well" from Paragraph 3 of the Printed Lease into Paragraph 26 of Exhibit "A." In fact, that approach would seem to take exactly the opposite approach mandated by the superseding provision in Exhibit "A"; we would be resolving the conflict by giving superseding effect to the terms of the Printed Lease. Also, looked at from a different perspective, the power that Appellant ascribes to the "at the well" measure accentuates the level of conflict between Paragraph 3 and Paragraph 26, and thus, it pulls the trigger even harder on Exhibit "A's" superseding provision.

Further, *Judice*, *Heritage Resources*, *Hyder II*, and *Burlington Resources* all recognize that a proceeds measure—not tied to particular point of sale—creates a measure that

does not allow the lessor to net-back its post-production costs.[14]  And if the rule were the one Appellant advocates, we could not account for the statements in *Judice* and *Heritage Resources* that in some circumstances, an "at the well" valuation measure and a proceeds measure may irreconcilably conflict.[15]  If the "at the well" measure, once it appeared, were so unalterably "baked into" (to use Appellant's term) the royalty formulation, then there would not be a conflict should a pure-proceeds measure also appear in a lease.  There could be no conflict because the "at the well" measure would vanquish any other measure that conflicts with it.

Nor is there a logical reason to make the "at the well" measure, once stated, unalterable if it is contrary to other controlling provisions of a lease.  Again, we are to glean the parties' intent from the terms they use, and the allocation of post-production costs—though traditionally on the shoulders of the lessor—may be allocated as the parties agree.  *See Hyder II*, 483 S.W.3d at 872; *Heritage Res.*, 939 S.W.2d at 122.

In essence, Appellant's position boils down to the argument that once it appears, the "at the well" measure is so "baked into" the royalty calculation that it has

---

[14]*See Burlington Res.*, 2019 WL 983789, at *5; *Hyder II*, 483 S.W.3d at 873; *Judice*, 939 S.W.2d at 136; *Heritage Res.*, 939 S.W.2d at 130.

[15]*See Judice*, 939 S.W.2d at 136 ("The term 'gross proceeds' means that the royalty is to be based on the gross price received by [Lessee] Mewbourne.  The use of the term 'at the well' indicates just the opposite, that the royalty is to be based on its value 'at the well.'"); *Heritage Res.*, 939 S.W.2d at 130 ("There is an inherent, irreconcilable conflict between 'gross proceeds' and 'at the well' in arriving at the value of the gas.").

to be physically removed by going to the length of actually striking those words wherever they appear. Both Appellant's reply brief and one of its recent briefs interpreting *Burlington Resources* cite a treatise that suggests this course.[16] And the logical implication of Appellant's argument is that if the "at the well" measure has the power it is portrayed as having, it would have to be physically removed from the document to avoid its all-consuming effect.

But *Burlington Resources*'s holding—that a proceeds measure may still be subject to an "at the well" point of valuation—does not state such a hard and fast rule. 2019 WL 983789, at *5. The supreme court in *Burlington Resources* summarized its holding as follows:

> To sum up, the Valuation Clause specifies that the royalty payment shall be calculated based on the "amount realized" from the sale, but the agreements also provide that the royalty interest shall be delivered "into the pipelines, tanks, or other receptacles with which the wells may be connected." In the context of these agreements, this latter term fixes the royalty's valuation point at the physical spot where the interest must be delivered—at the wellhead or nearby.

---

[16]Appellant's reply brief includes the following quote:

> If the parties agree that the net[-]back methodology should not be used, nowhere in the royalty clause provision should there be a reference to "at the well" or "at the mouth of the well." Even agreeing on a downstream point of valuation, such as "point of sale," will be ineffective to reach that result where the "point of sale" is the wellhead even where the wellhead sale is a non-arms'-length transaction. *Attaching addenda to form leases that contain "at the well" language should be discouraged unless one crosses out such references in the form leases.*

Martin & Kramer, *supra*, § 645.2 at 614.14.

34

*Id.* at *11. The supreme court in *Burlington Resources* interpreted the unique language of the instruments it examined and did not deal with the situation we face—a lease that contains two contradictory royalty measures and a provision that dictates how to reconcile that conflict.

Finally, Appellant urges that we look to the Fifth Circuit's opinion in *Warren* because it "is arguably the most significant precedent on the valuation point issue presented here, because the leases in that case comprised a preprinted form that provided for royalties based on a value 'at the well,' together with a typewritten addendum that prohibited post-production costs." Obviously, *Warren* reached the conclusion that Appellant wants—the lessor bore the burden of post-production costs—but *Warren*, as with *Burlington Resources*, did not deal with the lease structure at issue in this appeal. *See id.*; *Warren*, 759 F.3d at 415–19.

The printed lease in *Warren* stated an "at the well" point of valuation, though it used the term "amount realized" as the yardstick.[17] 759 F.3d at 416. The provision in the addendum at issue in *Warren* had two sentences. *Id.* The first sentence was the

---

[17] *Burlington Resources* described the basis for *Warren*'s holding as follows:

> [In *Warren*], the agreement provided that the royalty holder would receive a percentage of the "amount realized" by the lessee. But this language was modified with language that the amount realized shall be "computed at the mouth of the well," leading the court to conclude that "the royalty is based on net proceeds, and the physical point to be used as the basis for calculating net proceeds is the mouth of the well."

2019 WL 983789, at *10 (citing *Warren*, 759 F.3d at 417).

35

classic no-deductions clause that everyone agrees is surplusage under *Heritage Resources*. *See id.* at 418 (citing *Heritage Res.*, 939 S.W.2d at 130–31). The second sentence states that the lessor bore "a proportionate part of all those expenses imposed upon Lessee by its gas sale contract to the extent incurred subsequent to those that are obligations of Lessee." *Id.* The court in *Warren* construed this sentence to mean that "[t]o the extent that a gas sale contract requires the lessee to bear the cost of delivering marketable gas to a sales point other than the mouth of the well, the second sentence expressly provides that the lessor will bear a proportionate part of all those expenses." *Id.* at 419.

Here, the second sentence of Paragraph 26 has completely different language than that used in *Warren*'s addendum. Thus, the distinguishing factor between the documents we interpret and those in *Warren* is not the presence of an addendum but the language used in the addendum.

In our view, the provisions of Paragraph 26 of Exhibit "A" do not approach the reallocation of post-production costs by altering the point of valuation to determine the market-value measure and, by this means, impact where along the post-production path to allocate costs. Instead, an entirely different royalty measure is created by Paragraph 26—the pure-proceeds measure—and this different measure is what places the burden of post-production costs on Appellant/Lessee. This measure is contrary to the "at the well" measure stated in the Printed Lease and thus supersedes the Printed Lease.

36

**2. The El Paso Court of Appeals's opinion in *SandRidge* may conflict with our holding, but nothing in that opinion causes us to question our analysis.**

Appellant relies on the El Paso court's opinion in *SandRidge*. 454 S.W.3d at 606. That reliance is understandable because the El Paso court examined a paragraph almost identical to Paragraph 26 of Exhibit "A" and found that it did not alter an "at the well" valuation into a proceeds valuation. *See id.* at 614–15. We are not swayed by *SandRidge* to question our analysis because the El Paso court disposed of the meaning of the provision before it in one sentence without analyzing the arguments that we face. Further, the interrelation of the paragraphs in the *SandRidge* lease with its royalty clause is different than the one we face, and that difference in terms makes the conflict less stark than the one we resolve.

In *SandRidge*, the El Paso court engaged in a lengthy analysis and concluded that a royalty provision in the lease it interpreted provided for a market-value-at-the-well valuation. *Id.* at 613–14. The lease in *SandRidge* contained a paragraph 7 that is almost identical to Paragraph 26 at issue in this appeal:

> 7. NO DEDUCTIONS. Lessee agrees that all royalties accruing under this lease (including those paid in kind) shall be without deduction for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and otherwise making the oil, gas[,] and other products hereunder ready for sale or use. Lessee agrees to compute and pay royalties on the gross value received, including any reimbursements for severance taxes and production related costs.

37

*Id.* at 609. The court in *SandRidge* summarily rejected an argument that its paragraph 7 had any effect on the already established "at the well" royalty measure:

> Appellants next contend that construing paragraph 4(B) as a market[-]value[-]at[-]the[-]well clause renders paragraph 7 of State Leases meaningless. Paragraph 7 is a "no deduct" clause, prohibiting the deduction of post-production expenses from all royalties accruing under the State Leases. This is precisely the sort of clause that a market[-]value[-]at[-]the[-]well provision renders "surplusage as a matter of law." *Heritage Res*[.], 939 S.W.2d at 123.

*Id.* at 614.

The court in *SandRidge* did not note, and certainly did not examine, the difference between its paragraph and the one interpreted in *Heritage Resources.* That difference is the last sentence stating that "Lessee agrees to compute and pay royalties on the gross value received." *Id.* at 609. Obviously, that sentence and Exhibit "A's" instruction that its terms supersede is the lynchpin of this appeal and our analysis. In our view, the presence of that sentence in Exhibit "A" in the leases before us takes Paragraph 26 from the status of surplusage to a provision that is contrary to the "at the well" valuation point. We do not know if the El Paso court would have changed its view if presented with the argument we face, but we do conclude that the El Paso court's summary characterization gives us no basis to change our analysis.

And there is an interrelation between the royalty provision in *SandRidge* and its paragraph 7 that is absent from the lease before us. Because the royalty clause that the court in *SandRidge* construed used the term "gross production," that opinion concluded that the royalty clause provided for an "at the well" valuation point. *Id.* at

613. Though the royalty provision also used the words "gross price paid," the court in *SandRidge* tied those words back to gross production and concluded that the "gross price paid" language did not turn the royalty provision into a proceeds provision. *Id.*[18] The court's conclusion in *SandRidge*—that the "gross price paid" language in the royalty provision did not alter an "at the well" valuation point—adds more force to an argument that the use of similar words in its paragraph 7 ("gross value received") was a reiteration of what the royalty provision already stated and was surplusage because it consisted of repeated but meaningless words.

### 3. We cannot harmonize the provisions at issue by holding that Paragraph 26 functions as a backstop provision.

Appellant argues that the last sentence of Paragraph 26 should be construed to perform a different purpose than setting the yardstick for the royalty and yardstick measure and instead should be viewed as a backstop provision. This is another aspect

---

[18]As set forth in *SandRidge*,

> Although paragraph 4(B) provides that market value may be determined by the gross price paid or offered, the substance to be valued by its gross price continues to be "gross production." In other words, this language refers to the gross price that might be paid or offered to SandRidge by a buyer for the raw gas—i.e., the price offered or received for gas at the well without any deduction from the royalty for the costs of production. This reading comports with the well-understood characteristics of royalty: "Royalty is commonly defined as the landowner's share of production, free of expenses of production." *See Heritage [Res.]*, 939 S.W.2d at 121–22 (citing *Delta Drilling Co. v. Simmons*, . . . 338 S.W.2d 143, 147 ([Tex.] 1960)).

454 S.W.3d at 614.

of Appellant's theme of harmony by which it argues that the last sentence of Paragraph 26 does not clash with the royalty valuation in the Printed Lease and does not alter that form's royalty valuation.

Appellant describes a backstop as a provision inserted in mineral leases to address the disparity that may arise from a difference in the market value of minerals in comparison to the price received by the lessee under a contract by which the gas is sold. Understandably, the sales price received from the contract executed some time ago may not align with the current market price. But we do not interpret the last sentence of Paragraph 26 to address that potential disparity because it does not contain language addressing how to resolve a disparity between the price received and the market price, and for this reason, the last sentence of Paragraph 26 cannot be interpreted as a backstop provision.

The situation addressed by a backstop exists because minerals may be sold by the lessor under the terms of gas sale or purchase contracts, and the price in those contracts may no longer reflect the reality of the current market. *Westport Oil & Gas Co., L.P. v. Mecom*, 514 S.W.3d 247, 253–54 (Tex. App.—San Antonio 2016, no pet.) (discussing cases examining the disparity between the price received under gas purchase or sale contract and measure set by lease royalty clause). A lessee that does not protect itself for a decrease in the market price may find that it has to pay the lessor a royalty based on a higher market price though it is only receiving the lower contract price because "[w]hen royalty payments are based on market value under an

40

oil and gas lease in Texas, the lessee owes royalties based on the price of gas on the open market, even though the gas was actually sold for less than this price under a long-term sales contract." *Yzaguirre*, 53 S.W.3d at 369 (citing *Tex. Oil & Gas Corp. v. Vela*, 429 S.W.2d 866, 871 (Tex. 1968)).

The disparity may be the reverse and create a situation when the market price is lower than the price set in the lessee's long-term sales contract. *Id.* at 369–70. If the mineral lease does not address this contingency, the lessor cannot complain that the lessee is reaping a bounty under the lease. *Id.* at 373 (stating that when lease entitles lessor to market-value royalty, lessor is entitled to royalty calculated only on the market value and not a higher royalty based on the amount realized by lessee under the sales contract).

Here, Paragraph 3 specifically protects the lessee should it receive a sales-contract price that is lower than the market price by "provid[ing] that on gas sold by Lessee[,] the market value shall not exceed the amount received by Lessee for such gas computed at the mouth of the well." Appellant argues that the second sentence of Paragraph 26 is the "counterpart" to the Lessee's protection in Paragraph 3 and that "[t]he backstop provision in [P]aragraph 26 of the Leases ensures that the [L]essor would not receive royalties on a lower current market value if the [L]essee's actual proceeds were much higher."

Appellees counter that turning the last sentence of Paragraph 26 into a backstop provision requires us to judicially amend the lease and to add words to its

provisions. In their view, Paragraph 26 of Exhibit "A" has no language indicating that its purpose is to reconcile a disparity between a market price and a sales contract price because it "does not have the conditional 'provided that' language appearing in the backstop provision in [P]aragraph 3, nor does it mention or reference market value at the well. It plainly states [that] royalties will be computed and paid on the gross value received—the opposite of market value at the well."

We agree with Appellees. Paragraph 26's last sentence provides, "Lessee agrees to compute and pay royalties on the gross value received . . . ." It does nothing to reconcile a disparity between the gross value received and the market value. *See Westport Oil & Gas Co., L.P.*, 514 S.W.3d at 254 (holding that when royalty was stated as percentage of market value at the well, "[t]he gas purchase agreement minimum sales price formula [did] not apply to the royalty provision, and the royalty owed [was] exactly what the lease state[d]"). We would violate our duty to take the words as we find them if we added the words necessary to turn the provision into a backstop provision that reconciled the two measures. *See Arlington Surgicare Partners*, 2015 WL 5766928, at *2 (stating that we "cannot change the contract merely because we or one of the parties comes to dislike its provisions or thinks that something else is needed in it").

Even the case relied on by Appellant/Lessee supports our view. Appellant cites us again to the El Paso court's opinion in *SandRidge* and this time looks to that opinion's interpretation of a royalty provision's use of the term "gross price paid" as a

42

protection of "the lessor in the event a long-term gas purchase agreement between the lessee and a buyer results in the gas being sold at a premium over a lower, then-current market value." 454 S.W.3d at 614. But *SandRidge* interpreted a provision stating its royalty calculation as

> *25%* part of the gross production or the market value thereof, at the option of the owner of the soil or the Commissioner of the General Land Office, such value to be based on the highest market price paid or offered for gas of comparable quality in the general area where produced and when run, or the gross price paid or offered to the producer, *whichever is the greater.*

*Id.* at 608 (emphasis added). This provision—which is not found in Paragraph 26—directs how to choose between two measures. Unlike the provision in *SandRidge*, Paragraph 26 does not reconcile a difference between two measures but merely instructs the single measure to be used in calculating the royalty.

## C. We conclude that Appellees do not bear the burden of post-production costs.

We have tried to pull the interpretive threads that guide us through the phrases in Paragraph 3 of the Printed Lease and in Paragraph 26 of Exhibit "A" and to weave a coherent whole. At the end of that process, we share the frustration recently expressed by the supreme court when it described the effort that comes with trying to glean the parties' intent from the "recondite" terms of royalty clauses that are layered on top of each other and that clash in the measure they create.[19] We glean and

---

[19]As the supreme court recently stated in *Burlington Resources*,

43

conclude that the trial court properly granted summary judgment that the leases at issue were breached by Appellant's deduction of post-production expenses from Appellees' royalty payments. We overrule Appellant's first issue.

## VIII. Appellant Owes Royalty on Plant and Compressor Fuel

In its second issue, Appellant challenges whether the leases accord it the right to use gas produced from Appellees' property to conduct operations off the leased premises and not pay a royalty on that gas. To answer this question, we focus on the leases' "free use" provision—a provision that allows a lessor to use minerals produced from a leased premise to conduct operations and, as the name of the provision suggests, not pay a royalty for those minerals. Here, Appellant used gas produced from the leases as fuel for operations conducted outside the leased premises. We interpret the "free use" provision of the leases to avoid the payment of royalty only for minerals used to conduct operations on the leased premises. Appellant used the gas to conduct the operations off the leased premises, and thus, the "free use" clause

---

> We conclude that the rules of contract construction favor Burlington's interpretation of this recondite clause. But the parties could have saved considerable time, money, and heartache if their cryptic language had truly been "delivered . . . into the . . . receptacle[ ]." It could then have been re-written to say exactly what the parties intend, without resort to industry jargon, outdated legalese, or tenuous assumptions about how judges will interpret industry jargon or outdated legalese. If you can't understand what your contract means without asking the lawyer who wrote it, you should not be surprised later if judges—who can't just take your lawyer's word for it—also have trouble understanding what it means.

2019 WL 983789, at *9 n.10.

did not free it from the payment of royalty on the gas used to fuel those operations.

## A. The Parties' Stipulations

Appellant has not paid Appellees a royalty on gas that the parties described as Plant Fuel and Compressor Fuel. The parties stipulated to the meaning of the terms and to how the gas used as Plant and Compressor Fuel is segregated from other gas produced from Appellees' leases, which we summarize in relevant part below.

Appellant meters gas from each of the wellheads on the leases. The gas produced from the leases is then "commingled" with gas produced from other leases in the area held by Appellant. The commingled gas is transported to a processing plant operated by a third party.

Part of this commingled gas—the part defined as Plant Fuel—is the subject of a contract between Appellant and the third party that operates the processing plant. Appellant pays the third party "to gather [Appellees'] Gas and gas from other [of Appellant's] wells in the area, process the gas to extract liquids, and redeliver the processed gas and processed liquids to [Appellant]." A negotiated term of the contract between Appellant and the third party allows that party to use a portion of the gas delivered by Appellant as fuel to operate the processing plant. The third party delivers the processed gas to Appellant, and Appellant then sells the gas to third parties. Appellant is not paid by the third party for the portion of the gas used to fuel the processing plant. The portion of the gas used to fuel the plant is consumed and

45

thus is not redelivered to Appellant for downstream sales, and Appellant does not pay royalty to Appellees for the Plant Fuel.

Appellant also does not pay Appellees for what the parties defined as Compressor Fuel. The parties' stipulations describe the use of the Compressor Fuel as a part of the fuel that the third party delivers to Appellant. The third party

> redelivers a portion of the commingled processed gas to [Appellant], which [Appellant] then transports to various well sites, including well sites on lands covered by the [leases at issue]. [Appellant] uses some of this processed gas to power compressors ("Compressor Fuel"). The compressors are used in [Appellant's] operations on various well sites, including on the [leases at issue], to increase production of gas. The compressors used for [Appellant's] operations on the [l]eases are located on the [l]eases.

The parties' stipulations further note that Appellant "does not pay [Appellees] royalty on gas used for Compressor Fuel. Gas used for Compressor Fuel is consumed by the compressors, and it is not redelivered to [Appellant] for downstream sales."

The trial court concluded that Appellant had breached the leases by not paying Appellees a royalty on the Plant and Compressor Fuel. The interlocutory judgments incorporated into the Consolidated Final Judgment awarded damages for the amounts that the parties stipulated that Appellees should have received if Appellant were obligated to pay royalty on the Plant and Compressor Fuel.

## B. The "free use" provision of the leases governs whether Appellant could use the Plant and Compressor Fuel without paying royalty on the gas used as fuel.

To resolve the question of whether royalty is owed for Plant and Compressor Fuel, we must first decide which provision of the leases governs the question of

46

whether Appellant pays royalty on the Plant and Compressor Fuel. The leases contain a specific "free use" provision, and the parties have given us no reason to look beyond the provision that specifically deals with the question of the free use of gas. The "free use" clause of the lease provides that "Lessee shall have free from royalty or other payment the use of water, other than water from Lessor's wells or tanks, and of oil, gas[,] and coal produced from said land in all operations which Lessee may conduct hereunder, including water injection and secondary recovery operations, and the royalty . . . shall be computed after any so used."

Appellees/Lessors also direct us to an aspect of the royalty provisions that deal with the payment of royalty for gas "used off the premises." We do not view this statement as giving direction as to the free use of gas or providing any additional guidance beyond that provided by the "free use" clause. *See Sefzik v. Mady Dev., L.P.*, 231 S.W.3d 456, 461 (Tex. App.—Dallas 2007, no pet.) ("When interpreting an agreement, '[s]pecific and exact terms are given greater weight than general language.'" (quoting *Pratt-Shaw v. Pilgrim's Pride Corp.*, 122 S.W.3d 825, 829 (Tex. App.—Dallas 2003, no pet.))). Instead, we agree with Appellant that the "free use" provision provides more specific guidance on the issue. Specifically, we agree with Appellant's conclusion that

> [t]he only way to give meaning to the ["]free use["] provision is to construe it as an exception to the general royalty provision and apply it to volumes that would otherwise bear royalties. The scope of the express ["]free use["] provision controls, and the proper inquiry,

47

therefore, is whether the Plant Fuel and Compressor Fuel volumes are used in "operations which Lessee may conduct hereunder."

Focusing on the "free use" clause also avoids the interpretive morass involved in deciphering the phrase "used off the premises." *See Southland Royalty Co. v. Pan Am. Petroleum Corp.*, 378 S.W.2d 50, 52–57 (Tex. 1964) (op. on reh'g) (interpreting effect on royalty calculation of the phrase "used off the premises"); *Hutchings v. Chevron U.S.A., Inc.*, 862 S.W.2d 752, 756–58 (Tex. App.—El Paso 1993, writ denied) (same).

For the same reason, we reject Appellees' argument that Appellant should pay royalty because Appellant is receiving a value for the use of the gas and that the obligation to pay Appellees for the "gross value received" sweeps up the value received from the Plant and Compressor Fuel. We will address how the use of the word "value" impacts one of Appellant's arguments, but we do not view the "gross value received" clause as having an impact on the question of whether the "free use" clause permits a royalty-free use of gas outside Appellees' leased premises. The "free use" clause provides a specific direction on this issue, and that clause is the best indication of the parties' intent on whether royalty is owed for the Plant and Compressor Fuel.

## C. The "free use" provision limits a royalty-free use of minerals to operations conducted on the leased premises.

Focusing on the "free use" clause, the question turns on the interpretation of the "free use" clause's limitation in the scope of the free use by its words "in all operations which Lessee may conduct hereunder" and specifically whether the use of

48

the word "hereunder" limits the free use of gas to operations conducted on the leased premises. We conclude that it does, and because Plant and Compressor Fuel is used off the leased premises, Appellant must pay royalty on it.

We will refer to the Texas cases cited by the parties below, but we begin by noting that the cited cases provide little guidance in resolving the interpretation question before us. For that reason, we look to treatise commentaries and to a recent opinion from a federal circuit court of appeals for guidance.

The treatise commentaries do not provide precise direction but suggest that "free use" clauses traditionally limit the free use to the leased premises. *See* 3A *Summers Oil & Gas* § 33:16 (3d ed. 2018) ("Where the lease provides for free gas to the lessor for domestic purposes or provides that the lessee is privileged to use the gas in operating the lease, it is generally held that the gas used for these purposes should be excluded in the calculation of the lessor's royalty."); Martin & Kramer, *supra*, § 661.4 at 763 ("Usually it is held that the lessor's free gas may not be used off the leased premises, such holding being based on the construction of the [']free gas['] clause as being applicable to particular dwellings on the premises.").

More precise direction comes from the Tenth Circuit in *Anderson Living Trust v. Energen Resources Corp.*, 886 F.3d 826 (10th Cir. 2018). One of the leases that the court in *Anderson* examined contained a "free use" clause providing that the lessor "shall have free use of oil, gas[,] and water from said land . . . for all operations hereunder."

49

*Id.* at 848.  The court in *Anderson* defined and integrated the word "hereunder" into the "free use" provision as follows:

> The plain meaning of "hereunder" is "under or in accordance with this writing or document" or "[a]s provided for under the terms of this document."  *See* https://www.merriam-webster.com/dictionary/hereunder; https://en.oxforddictionaries.com/definition/hereunder; *see also* Black's Law Dictionary (10th ed. 2014) (defining "hereunder" as "[l]ater in this document" or "[i]n accordance with this document").   The term "hereunder" qualifies the phrase "all operations."  *So, to be free of royalties, the use of the gas must be for operations "under or in accordance" with the lease or "as provided for under the terms" of the lease.*

*Id.* (emphasis added).

Here, the leases use the word "hereunder" to qualify a phrase almost identical to the one used in *Anderson*.  In the leases under review in this appeal, the word "hereunder" qualifies the phrase "in all operations which Lessee may conduct."  With such similar language, we interpret the language of the leases that we review to also require that the use is free of royalty if "the use of the gas [] be for operations 'under or in accordance' with the lease or 'as provided for under the terms' of the lease."  *See id.*

The court in *Anderson* determined that the terms of the lease it reviewed leased the premises to conduct operations "thereon."  *Id.* at 849.  With this term, the *Anderson* court concluded that the purpose of the lease was to allow the lessor "to produce oil and gas from the leased premises and to store oil and build infrastructure on the leased premises."  *Id.*  This purpose limited the scope of the "free use" clause to gas used in operations conducted on the leased premises:

50

Thus, the operations called for by the lease are those occurring on the leased premises. As a result, the plain language of the "free use" clauses in these leases suggests only gas used on the leased premises is free of royalty. Fuel gas used off the leased premises is not a free use.

*Id.*

Though obscured in a fog of verbiage, the leases at issue appear to also have the purpose of conducting lease operations "thereon" the leased premises:

Lessor . . . hereby grants, leases[,] and lets exclusively to Lessee for the purpose of investigating, exploring, prospecting, drilling[,] and mining for and producing oil, gas, sulphur, fissionable materials[,] and all other minerals (whether or not similar to those mentioned), conducting exploration, geologic and geophysical tests and surveys, injecting gas, water[,] and other fluids and air into subsurface strata, laying pipelines, establishing and utilizing facilities ~~for the disposition of salt water~~, dredging and maintaining canals, building roads[,] bridges, tanks, telephone lines, power stations[,] and other structures *thereon*, and on, over[,] and across lands owned or claimed by Lessor adjacent and contiguous thereto necessary to Lessee in operations to produce, save, take care of, treat, transport[,] and own said minerals, the following described land in Hood & Somervell Counties, Texas[.] [Emphasis added.]

Though a minor point, the limited scope of the "free use" clause is also signaled by the phrase that follows the word "hereunder" in that clause. The specific language of the clause is "hereunder, including water injection and secondary recovery operations." Though it does not say so explicitly, it would be unreasonable to read these words to authorize a royalty-free use for operations that occur off the leased premises. This at least hints that that the word "hereunder" speaks to a limit of free use that occurs on the leased premises.

Thus, we interpret the language of the "free use" clause and the purpose of the lease to be the same as in *Anderson* and apply its holding and guidance to our facts.

51

The "free use" clause does not authorize a royalty-free use of gas that occurs off the leased premises.

As we explained above, we turned to the Tenth Circuit opinion in *Anderson* because the Texas cases cited by the parties give little guidance to resolve the question of whether the "free use" provision freed Appellant from paying a royalty on Plant and Compressor Fuel. Appellant cites *Mitchell Energy Corp. v. Blakley*, 560 S.W.2d 740, 744 (Tex. App.—Fort Worth 1977, writ ref'd n.r.e.). But *Mitchell* held that gas sold to a third party but used on the leased premises fell within the ambit of a "free use" clause. *Id.* at 743–44. Application of *Mitchell* to our issue begs the question. In *Atlantic Richfield v. Holbein*, also cited by Appellant, the Dallas court held that gas used for compressor operations fell within a "free use" clause. 672 S.W.2d 507, 515–16 (Tex. App.—Dallas 1984, writ ref'd n.r.e.). But the Dallas court supported its holding primarily by looking to industry custom and usage rather than to the language of the "free use" clause, and we conclude that it is inapposite to the issue before us. *See id.*

We will also address two subordinate arguments made by Appellant. First, Appellant argues that if we accept (as we have) Appellees' argument that Paragraph 26 creates a pure-proceeds royalty measure, then it should not pay royalty on the Plant and Compressor Fuel because it receives no proceeds from the sale of that fuel. Appellees respond that the superseding provision of Paragraph 26 requires Appellant to calculate royalty not on proceeds but on the broader term of value, and Appellees note that "'[v]alue is broader than, and not limited to, proceeds.' *See Value*, Merriam-

*Webster's Collegiate Dictionary* 1382 (11th ed. 2009) (defining value as 'a fair return or equivalent in goods, services, or money for something exchanged')." Indeed, when a lease defined proceeds—in words similar to the definition of value used by Appellees—as "the entire economic benefit and all consideration in whatever form received by or accruing to Producer," a court agreed that there were "proceeds" from gas used for fuel and that a royalty was owed. *See HighMount Expl. & Prod. LLC v. Harrison Interests, Ltd.*, 503 S.W.3d 557, 561–63 (Tex. App.—Houston [14th Dist.] 2016, no pet.).

Appellant also attacks Appellees' statement that it "receives value from [the third party's] use of Plant Fuel in the form of lower processing costs" as being unsupported by the record. But no matter what the specific nature of the value received by Appellant, it surely receives something in return for the gas that fuels the plant. In fact, the parties stipulated as to the "value" of the Plant Fuel "gas attributable to [Appellees'] interests."

We reject Appellant's argument that it received nothing of value from allowing the third-party free use of the Plant Fuel and that it thus owed nothing as royalty. Undoubtedly Appellant received some value by allowing free use of the fuel. Not only is it common sense that Appellant would permit the use of the gas only if it received some value but also the parties were able to quantify that "value" in their stipulations.

Appellant also argues that Compressor Fuel is used on the leases to benefit Appellees. As we interpret the argument, Appellant begins with the premise that a portion of the Compressor Fuel is commingled with gas from other leases as it emerges from the tailgate of the plant, that it returns to compressors on Appellees' leased premises, and that the operation of those compressors benefits the operations of Appellees' leases. In Appellant's view, Appellees place the impossible burden on Appellant to account for which specific molecules of gas go to fuel compressors on Appellees' leases and which go to fuel compressors on other leases. Appellant's argument continues that all the gas that is produced and sold from Appellees' leases is commingled with gas from other leases and then the royalty is calculated based on the allocation of the volume of gas produced from the respective leases.

Appellant appears to argue (1) that Appellees have never challenged the fact that gas is commingled from the production coming from various leases or by objecting to the commingling of gas generally and (2) that having never made that challenge, Appellees should not be able to challenge in this suit that commingled gas is used to power compressors on their leases and others and should not be able to force Appellant to account for which portion of commingled gas goes to which compressor. In essence, the concept of "all for one and one for all" demonstrates the benefit that Appellees receive from the commingled gas powering the various compressors.

Appellees respond that by commingling the Compressor Fuel, Appellant also assumed the duty of accounting for the aliquot share of the gas that returns to fuel the compressors on Appellees' leases and cannot simply take what it claims to be Compressor Fuel and deduct that entire volume from the amounts upon which it pays royalty.[20] Indeed, Appellant never tells us or points to anything in the record that explains why it can make the allocation of commingled gas to pay royalty but why it cannot make a corresponding allocation to establish which portion of the commingled gas is used to power compressors on Appellees' leases and on leases owned by other lessors.[21]

---

[20]Appellees cite *Humble Oil & Refining Co. v. West*, 508 S.W.2d 812 (Tex. 1974). *Humble Oil* explains the duty to account that results from commingling as follows:

> As a general rule, the confusion of goods theory attaches only when the commingled goods of different parties are so confused that the property of each cannot be distinguished. Where the mixture is homogeneous, the goods being similar in nature and value, and if the portion of each may be properly shown, each party may claim his aliquot share of the mass. Additionally, the burden is on the one commingling the goods to properly identify the aliquot share of each owner; thus, if goods are so confused as to render the mixture incapable of proper division according to the pre-existing rights of the parties, the loss must fall on the one who occasioned the mixture. Stated differently, since Humble is responsible for, and is possessed with peculiar knowledge of the gas injection, it is under the burden of establishing the aliquot shares with reasonable certainty.

*Id.* at 818 (citations omitted).

[21]As we read the parties' stipulations, Appellant deducts the entire volume of fuel used to power compressors on both Appellees' leases and leases owned by others from the volume used to calculate the royalty: "[Appellant] does not pay [Appellees]

And we see a false equivalency in the argument that Appellees have allowed their gas to be commingled with production from other leases and sold. In that situation, apparently, Appellant has the data to and does perform an allocation between the gas commingled from various leases. Appellees are not complaining about the concept of commingling in general but instead argue that they have no reassurance that production from their leases is being used disproportionately to aid the production of other leases. Again, Appellant agreed for each Appellee to a stipulation of the value of the gas used as Compressor Fuel. This indicates that Appellant can allocate the volumes of Compressor Fuel among the leases it operates. Further, Appellant cites no specific provisions of the leases that permits it to use volumes of Plant and Compressor Fuel from Appellees' leases to benefit other lessors.

## D. Appellant is obligated to pay royalty on Plant and Compressor Fuel

The "free use" clause provides only for the royalty-free use of gas on the premises of the leases. Because Appellant uses gas outside those confines, it owes royalty on the Plant and Compressor Fuel. We overrule Appellant's second issue.

## IX. Attorneys' Fees

In its conditional third issue, Appellant challenges the trial court's award of attorneys' fees if we "reverse[] the summary judgment in whole or in part." We have

---

royalty on gas used for Compressor Fuel. Gas used for Compressor Fuel is consumed by the compressors, and it is not redelivered to [Appellant] for downstream sales."

overruled Appellant's dispositive issues attacking the trial court's summary judgment. Thus, we have no basis to review the attorneys' fee award and therefore overrule Appellant's third issue as moot.

## X.  Conclusion

Having overruled Appellant's first and second issues, which are dispositive of this appeal, we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered:  April 18, 2019